KELLY, MESSICK, SCHOENLEBER & MILLER ASSOCIATES, A PARTNERSHIP, AND MARTIN P. SCHOENLEBER, LEONARD MILLER AND FRANK KELLY, PLAINTIFFS-RESPONDENTS, v. ATLANTIC MUTUAL INSURANCE COMPANY, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 19, 1987—Decided July 7, 1987.

Before Judges MICHELS, SKILLMAN and LANDAU.

*Arthur P. Condon* argued the cause for appellant.

*Jill S. Frankel* argued the cause for respondents (*McCarthy and Schatzman,* attorneys; *Michael A. Spero,* of counsel; *David N. Bregenzer, Jr.,* on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Defendant Atlantic Mutual Insurance Company (Atlantic Mutual) appeals from a judgment of the Law Division which declared that it had a duty to defend and indemnify plaintiffs Kelly, Messick, Schoenleber & Miller Associates (KMSM) and Martin P. Schoenleber (Schoenleber), Leonard Miller (Miller) and Frank Kelly (Kelly) in a separate civil action for damages

brought against them by the purchasers of units in the Bienvenue Condominiums.

The pertinent facts giving rise to this appeal may be summarized as follows. In conjunction with Kelly, Schoenleber and Miller, in April 1979, Messick formed the real estate partnership of KMSM. The partnership was established specifically to purchase condominiums at two projects: Bienvenue Condominiums in Burlington, New Jersey, and Florence Tollgate Condominiums in Florence, New Jersey. At the time of its formation, the partnership purchased approximately 150 units at each location. It was Messick's understanding that the condominium units consisted of everything from "the drywall in." He testified that the condominium association owned the heating system. Although Messick was aware that each condominium owner enjoyed a share of the common elements, he did not know if such an interest constituted ownership.

Several years prior to purchasing these condominiums, Messick and Schoenleber conducted a study of them for Commonwealth Federal Savings and Loan (Commonwealth). Commonwealth had acquired the properties from the original owner, Woodlane Realty, by deed in lieu of foreclosure. Because, at that time, the condominiums were unsaleable, Commonwealth requested Messick and Schoenleber to prepare various "sales and marketing strategies." This work, as well as an investigation as to necessary maintenance and repairs, was performed in 1977 or 1978 by GMS Management (GMS), a partnership formed by Messick and Schoenleber for purposes of managing distressed real estate.

Among the areas which GMS investigated were the underground central heating systems at Florence Tollgate and Bienvenue. The discovery of extensive corrosion in the main distribution pipes at Florence Tollgate engendered concern about the Bienvenue system; since the same developer was involved with the central distribution system used at each project, Commonwealth was worried that a corrosion problem might also exist at

Bienvenue. However, upon excavating parts of the Bienvenue heating system, GMS discovered that the pipes were not corroding. In light of this discovery, prior to KMSM taking title, Commonwealth agreed to provide funds to repair the heating system only at the Tollgate Condominiums; appropriating funds for repairs at the Bienvenue Condominiums was deemed unnecessary.

KMSM obtained insurance coverage for the condominiums it purchased at both projects. The policy was underwritten by Atlantic Mutual and secured for KMSM by Atlantic Mutual's agent, Flanigan & O'Hara. Messick met with a representative from Flanigan & O'Hara and explained to him that KMSM wanted fire and theft coverage on the individual units and general liability coverage for the partnership. Additionally, Messick testified that the agent was aware that KMSM had purchased the condominiums in order to resell them.

The policy issued to KMSM was a safeguard policy, providing first-party coverage on the real property and comprehensive general liability coverage. It had effective and expiration dates of July 15, 1980 and July 15, 1983, respectively. However, as there was no need to maintain insurance on condominiums which KMSM no longer owned, someone from the partnership would report to Flanigan & O'Hara how many units were sold each calendar quarter. As a result, the insurance was canceled on those units, an adjustment was made to the policy and/or a return premium was sent to KMSM. The policy itself did not indicate how many units the partnership owned.

The policy did specify that the coverage was for "Dwelling—one family," "vacant building—not one or two family" and for "lessor's risk only." However, "lessor's risk" is not defined in the policy, and Messick testified that he did not understand the meaning of that term. Charles W. Brownholtz (Brownholtz), the claims supervisor for Atlantic Mutual, opined that lessor's risk described KMSM's insurable interest in the property: as long as KMSM was the lessor, it retained an interest in the

condominiums; however, upon the sale of the units, the risk shifted to the purchaser.

On September 7, 1982, suit was instituted against KMSM and others. Messick testified that plaintiffs in that action had alleged that the Bienvenue condominium units which they purchased from KMSM had damaged heating systems. Messick conceded that, while he was involved with Bienvenue, there were commonplace mechanical problems which were fixed. Moreover, he stated that one section of the heating system required extensive repair work because the elbows (a portion of the heating lines) were corroded. But even in that area of the system, the main lines were sound. Thus, the corrosion problem which gave rise to the suit was neither expected nor intended by KMSM. Indeed, to Messick's knowledge, there was never a break in the underground distribution line at Bienvenue because of corrosion. However, sometime after February 1982, the central heating system at Bienvenue was abandoned when 63% of the condominium owners voted to convert to individual gas-fired heating units.

The action by the purchasers of the Bienvenue Condominiums against KMSM was turned over to Atlantic Mutual for defense. However, Brownholtz determined that coverage should be denied. Upon reading the complaint filed against KMSM, Brownholtz felt that the charges, if true, were descriptive of "intentional acts which would not meet the general definition of occurrence." With respect to the count in the amended complaint which charged KMSM with negligently failing to investigate or fulfill its duty, Brownholtz testified that there was "no accident or occurrence as far as [he was] concerned." However, in his deposition taken March 14, 1984, Brownholtz stated that coverage should have been extended for those counts charging KMSM with negligence.

Upon considering this testimony, the exhibits and the briefs submitted, the trial court noted that the complaint filed against KMSM charged myriad wrongdoing, including intentional torts,

consumer fraud, fraud and negligence. The claim asserted by KMSM was to force Atlantic Mutual to provide a defense for the negligence counts. Although many of the contracts for sale and closings with respect to the Bienvenue Condominiums were consummated within the period in which KMSM's policy was in effect, Atlantic Mutual denied coverage on the ground that the complaint charged KMSM with intentional conduct and the policy only covered KMSM for negligence.

In regard to the term "lessor's risk," the trial court observed that it was not defined in the policy. Furthermore, the trial court could not "recall any testimony that money was given back or that premiums stopped when the units were sold." Thus, the trial court apparently rejected Atlantic Mutual's argument that, after a unit was sold, the insurance on said unit was canceled and any subsequent loss was not covered.

The issue of whether the common elements, including the heating system, were covered by the policy was likewise resolved against Atlantic Mutual. The trial court explained that the policy neither describes exactly what parts of the property were covered nor expressly excludes the heating system from coverage. According to the trial court, this ambiguity had to be construed against Atlantic Mutual and, therefore, concluded that the heating system was covered.

Finally, the trial court noted that several counts of the amendments to the complaint charged KMSM with negligently failing to test for and warn of the defect in question. These failures were alleged to have occurred prior to the sale of the condominiums to the parties suing KMSM. As the policy required Atlantic Mutual to defend claims of alleged negligence, the trial court held that Atlantic Mutual had a duty to defend by supplying counsel and, since it failed to do so, to pay any counsel fees incurred by KMSM in providing its own defense. In addition, the trial court determined that Atlantic Mutual was required to pay any judgment rendered against KMSM based upon its negligence. This appeal followed.

## I.

### *Was There Coverage for the Central Heating System Under the Atlantic Mutual Policy Issued to KMSM?*

Viewed in its entirety, the record does not support the trial court's conclusion that the central heating system falls within the ambit of coverage under the policy. As the trial court correctly noted, the policy is silent as to whether or not the heating system is covered. Similarly, Messick's testimony on this point is unclear. Although stating that the condominium units consisted of everything from "the drywall in," Messick also noted that each owner enjoyed a share of the common elements. He was not certain if such an interest constituted ownership.

Any ambiguity about whether the central heating system should be covered under the policy may be resolved with reference to the master deed for the Bienvenue Condominiums. The following provisions of the deed make clear that KMSM, like all other condominium owners, owned a proportionate share of the common elements (including the heating system) and thus had an insurable interest therein:

> Every Unit, together with its undivided Common Interest in the Common Elements, shall for all purposes be and it is hereby declared to be and to constitute a separate parcel of real property and may be dealt with by the Unit owner thereof in the same manner as is otherwise permitted by the laws of the State of New Jersey for any other parcel of real property. The Unit Owner of a Unit shall be entitled to the exclusive ownership and possession of his Unit subject only to the covenants, restrictions, easements, By-Laws, rules, regulations, resolutions and decisions affecting the same and relating thereto as may be contained in the Condominium Documents or as may from time to time be passed in accordance with this Master Deed and the By-Laws. Each Unit may be held and owned by one or more Persons in any form of ownership, real estate tenancy or relationship recognized under the laws of the State of New Jersey.

> \*   \*   \*   \*   \*   \*   \*   \*

> The Common Interest of a Unit in the Common Elements shall be inseparable from such Unit, and any conveyance, lease, devise or other disposition or mortgage or other encumbrance of any Unit shall extend to and include the Common Interest in the Common Elements, whether or not expressly referred

to in the instrument affecting the same. The Common Interests of the Units in the Common Elements and the fee titles to the respective Units conveyed therewith, shall not be separately conveyed, transferred, alienated or encumbered and each of said Common Interests shall be deemed to be conveyed, transferred, alienated or encumbered with its respective Unit notwithstanding the description in the instrument of conveyance, transfer, alienation or encumbrance may refer only to the fee title to the Unit.

The Common Elements shall remain undivided and shall not be the object of an action for partition or division.

The Common Interest appurtenant to each Unit shall have a permanent character, shall be inseparable from each Unit and shall not be altered or changed without the consent of the Unit Owners affected and the first mortgagees of such Units as expressed in an amendment to the Condominium Documents.

■ Equally apparent from reading the master deed is that KMSM would not have intended to insure the central heating system. Paragraphs six, seven and ten of the deed specify that the maintenance and repair of the common elements are the responsibility of the condominium association. Indeed, paragraph 10C(vi) provides that:

It shall be the responsibility of the Unit Owner:

To refrain from repairing, altering, replacing, painting or otherwise decorating or changing the appearance of any portion of the Common Elements without first obtaining the consent in writing of the Association ...

Not only are the unit owners prohibited from unilaterally repairing the common elements, they are shielded from personal liability for any damage in connection with the use of the common elements. Paragraph 6(O) thus provides:

A Unit Owner shall have no personal liability for any damages caused by the Association or in connection with the use of the Common Elements ...

Lastly, it should be noted that the master deed stipulates that the condominium association is to maintain insurance on the central heating system. Paragraph 14 provides in part:

the Association shall obtain and maintain, to the extent available, insurance on the Buildings and all other insurable improvement[s] upon the land, including but not limited to, all of the Units, the heating and air cooling apparatus ...

     \*     \*     \*     \*     \*     \*     \*     \*

The Association shall obtain master policies of insurance which shall provide that the loss thereunder shall be paid to the Association as insurance trustee under this Master Deed. Under the said master policies certificates of insurance shall be issued which indicate on their face that they are a part of such

master policies of insurance covering each and every Unit of the Condominium and its Common Elements.

Also noteworthy is that, although paragraph 14D authorizes a unit owner to obtain physical damage insurance on his own unit, it does not confer authority upon the owner to obtain insurance on the common elements.

In construing a policy of insurance, as with any contract, the function of this court is to search for the probable common intent of the parties which, along with the general purposes underlying the policy, must guide us in its interpretation. *See Fidelity Union Trust Co. v. Robert,* 36 *N.J.* 561, 567 (1962); *Tooker v. Hartford Acc. and Indem. Co.,* 128 *N.J.Super.* 217, 222–223 (App.Div.1974); *Ins. Co. of State of Penna. v. Palmieri,* 81 *N.J.Super.* 170, 179 (App.Div.1963), certif. den. 41 *N.J.* 389 (1964). Here, although KMSM had an ownership interest in the central heating system, it was precluded from making repairs to the system and was protected against personal liability in connection with damage thereto. Furthermore, the responsibility of obtaining insurance coverage for all the common elements was delegated to the condominium association. In short, even though KMSM had an insurable interest in the central heating system, there was no reason for it to have obtained coverage for the system. Nor could KMSM have had any reasonable expectations of coverage. *Cf. Meier v. New Jersey Life Ins. Co.,* 101 *N.J.* 597, 612 (1986); *Kievit v. Loyal Protect. Life Ins. Co.,* 34 *N.J.* 475, 482 (1961). Thus, contrary to the conclusion reached by the trial court, the Atlantic Mutual policy did not, nor was it intended, to provide coverage for the central heating system at the Bienvenue Condominiums.

II.

*Was There Sufficient Credible Evidence From Which to Conclude That KMSM Canceled the Insurance on the Condominiums as They Were Sold?*

Even if we had determined that because the policy is ambiguous coverage should be deemed to extend to the central heating

system, *see Aetna Ins. Co. v. Weiss,* 174 *N.J.Super.* 292, 296 (App.Div.1980), certif. den. 85 *N.J.* 127 (1980), we would still have to decide whether the insurance on the condominiums in question was in effect after said units were sold. The trial court was unable to recall any testimony indicating that KMSM had canceled the insurance or received return premiums for the units which were sold. Presumably, the trial court concluded that coverage on all the units continued until July 15, 1983, the expiration date of the policy.

The trial court's findings and conclusions in this regard are clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction. We hold to a "definite conviction that the judge went so wide of the mark, a mistake must have been made." *State v. Johnson,* 42 *N.J.* 146, 162 (1964). "[W]e are convinced that [the factual findings and legal conclusions of the court] are so manifestly unsupported by [and] inconsistent with the competent, relevant and reasonably credible evidence [that they] offend the interests of justice[.]" *Formosa v. Equitable Life Assurance Society,* 166 *N.J.Super.* 8, 20 (App.Div.1979), certif. den. 81 *N.J.* 53 (1979). *See also Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 484 (1974); *Fagliarone v. North Bergen Tp.,* 78 *N.J.Super.* 154, 155 (App.Div.1963), certif. den. 40 *N.J.* 221 (1963).

The following excerpt from Messick's cross-examination indicates that KMSM did cancel the insurance and receive return premiums on the units which were sold:

Q. Okay. And you've testified that you reviewed the policy with Mr. O'Hara after it was purchased and you reviewed it once or twice subsequent to the purchase; is that correct?

A. Yeah, we—there was a provision in the policy that we identify those units that we no longer owned and we would contact the O'Hara Agency periodically to tell them which units, you know, had been sold and settled and then annually we would have reviewed the policies. That's our practice, to review coverages on an annual basis.

Q. And you, in fact, did that on a quarterly basis; did you not?

A. That's possible. I'm not—I don't recall the times.

Q. Well, do you know who did that for the real estate partnership?

A. Uh—I or one of my secretaries would have provided information to the Flanigan and O'Hara Agency.

Q. Okay. And the purpose for that was that once you no longer owned the unit you didn't want to keep paying insurance on it; isn't that correct?

A. Uh—well, I believe the policy had a—had two portions to it. One was insurance on the inside of the units, and the other would have been a general liability portion; and so if we didn't own a unit, we wouldn't need to insure the inside. It's my understanding that if there were a fire, for example, that the condominium association is responsible for the roof and the outside and that the condominium owner is responsible for what's inside if it burns. So that I believe that we would have been insuring, in part, for that inside. So that if we didn't own the unit anymore, we wouldn't need to insure that inside.

Q. *And, in fact, you notified the company through Flanigan and O'Hara to cancel these units as they were sold; isn't that correct?*

A. *That's correct.*

Q. *And for which you received a return premium; isn't that correct?*

A. *I presume so, yes.*

Q. *Or an adjustment to the policy which—*

A. *I presume so, yes.* (Emphasis supplied).

Furthermore, several letters from Flanigan & O'Hara to Atlantic Mutual and from KMSM to Flanigan & O'Hara confirm that the coverage obtained by KMSM for a given unit terminated at the end of the calendar quarter in which that unit was sold. A letter dated July 15, 1980 was sent by a Flanigan & O'Hara representative to an employee of Atlantic Mutual. The letter provides in part:

Please issue a policy for the captioned insured [KMSM] in accordance with your quotation of June 26, 1980 and our telephone conversation of July 8, 1980. The final premium quoted was $10,966.00. As I mentioned to you on the telephone, *we would like to have this based on a quarterly adjustment, since the insured will be selling some units during the course of the year.* (Emphasis supplied).

Another letter, dated December 5, 1980, from Flanigan & O'Hara to Atlantic Mutual reads as follows:

As we discussed on the telephone, the correct number of units owned by the insured [KMSM] as of 7/15/80 was 171. (Florence Tollgate 79—Bienvenue 92). The figure we gave you of 231, was correct when it was given in April, however, by the time we received the various quotations, etc., almost three months went by and they sold sixty more units. We are getting something in writing from the insured showing their totals as of 7/15/80, which will be forwarded to you when received.

Therefore, please endorse the captioned policy effective 7/15/80, reducing by sixty units. Based on the rates that you gave me, I get the following return

premiums: Policy Premium $2,811.00, NJGF $14.05, NJSC $36.54, for a total return premium of $2,861.59. The new policy premium should now be $8,261 and the tax should be $41.31 NJGF and $107.40 NJSC. These are the amounts being billed to our insured and I would appreciate your also using these figures.

That this procedure—making quarterly adjustments to the policy to reflect any sales by KMSM—was an ongoing one is evidenced by the correspondence between KMSM and Flanigan & O'Hara. By letters dated December 5, 1980; June 11, 1981 and August 4, 1981, KMSM provided Flanigan & O'Hara with a month-by-month breakdown of the condominium units owned by KMSM at Bienvenue and Florence Tollgate. These letters were likely intended to effectuate a reduction in the units covered by the insurance policy and a proportional decrease in the policy premiums. The general endorsements and all the other proofs in the record lead to the conclusion that such results were probably accomplished.

■ Consequently, the trial court's finding that the insurance coverage on KMSM's condominium units remained in effect for the entire policy period was against the weight of the evidence. The proofs show that the coverage on each condominium was terminated at the end of the calendar quarter in which that condominium was sold. In light of this conclusion, we need not consider the implications of "lessor's risk" as that term is used in the policy.

### III.

#### Was There an Occurrence Which Would Trigger Coverage Under the Policy?

If, contrary to our conclusion, we were to assume that the central heating system falls within the bounds of coverage of KMSM's policy, we would still have to consider whether or not there was an event triggering coverage. Any such event would had to have occurred prior to or shortly after the sale of the condominiums, while the insurance was still in effect. In this regard, count seven of the second amended complaint filed against KMSM and others is instructive:

62. Defendant knew or should have known of the existance [sic] of a substantial latent defect within the heating system of Bienvenue Condominiums prior to the negotiation of the sale of condominium units to plaintiffs.

63. By virtue of said knowledge defendants were under a duty to fully and adequately investigate, explore, test, and evaluate the heating system at Bienvenue Condominiums with regard to soundness, capacity to perform its function, its Likelihood [sic] of rapid deterioration, and its integrity as a heating system.

64. Defendants negligently failed to fulfill this duty prior to the completion of sales of condominium units to plaintiffs as members of the consuming public, to the detriment of plaintiffs.

Clearly, the wrongdoing charged in this count occurred prior to the cancellation of the insurance. Thus, we must determine whether KMSM's alleged negligence in failing properly to "investigate, explore, test, and evaluate the heating system at Bienvenue Condominiums" would trigger coverage under the policy issued by Atlantic Mutual.

The policy under which KMSM was insured was an occurrence policy. Coverage would be extended to KMSM in the event that it incurred personal injury, property damage or advertising liability due to an occurrence. Occurrence is defined in the policy as:

an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

The issue, therefore, is whether KMSM's alleged negligence fits within this definition.

There is an abundance of authority in this State that: the time of the "occurrence" of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but *the time when the complaining party was actually damaged. "The time of the accrual of the insured's liability is the determining factor, not the time of an event which ultimately results in liability."*

\* \* \* \* \* \* \* \*

The tort of negligence is not committed unless and until some damage is done. Therefore, *the important time factor, in determining insurance coverage where the basis of the claim is negligence, is the time when the damage has been suffered. [Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co.,* 98 *N.J.* 18, 27 (1984) (*quoting Muller Fuel Oil Co. v. Ins. Co. of No. Amer.,* 95 *N.J.Super.* 564, 578, 579 (App.Div.1967) (Emphasis supplied) ].

*See also Yarrington v. Camarota,* 138 *N.J.Super.* 398, 400–403 (App.Div.1971), aff'd *sub nom Yarrington v. Baldwin Manor, Inc.,* 60 *N.J.* 169 (1972); *Meeker Sharkey v. National Union Fire Ins.,* 208 *N.J.Super.* 354, 357 (App.Div.1986); *Middle Dep't Insp. Agency v. Home Ins. Co.,* 154 *N.J.Super.* 49, 53–54 (App.Div.1977), certif. den. 76 *N.J.* 234 (1978); *Deodato v. Hartford Ins. Co.,* 143 *N.J.Super.* 396, 401–403 (Law Div. 1976), aff'd o.b. 154 *N.J.Super.* 263 (App.Div.1977).

The case most closely resembling the instant one is *Middle Dep't Insp. Agency, supra.* There, plaintiff was a company which inspected electrical installations to assure that they complied with applicable laws and regulations. While insured under a general liability coverage policy issued by defendant Home Insurance Company (Home), plaintiff inspected the electrical wiring of a building in Long Branch, New Jersey. Approximately three years later, a fire occurred in that building, resulting in a lawsuit against plaintiff for negligent inspection. Home's policy was no longer in effect at the time of the fire.

Plaintiff forwarded the summons and complaint served upon it to Home. However, Home disclaimed any duty to defend or indemnify plaintiff on the ground that the policy in question had expired prior to the fire. Thereupon, plaintiff instituted a declaratory judgment action.

The trial court granted summary judgment in favor of Home, holding that its policy did not provide plaintiff coverage for the claim arising out of the fire. On appeal, we affirmed, noting that occurrence was defined in the policy as " 'an accident * * * which results, during the policy period, in bodily injury or property damage.' " 154 *N.J.Super.* at 53. We then concluded:

Although the allegedly negligent act of Middle Department took place within the policy period, the fire and the damage both occurred after the policy expired. It is therefore manifest that the occurrence involved therein was not one within the ambit of the Home policy. *See Yarrington v. Camarota,* 138 *N.J.Super.* 398 (App.Div.1971), aff'd 60 *N.J.* 169 (1972); *Muller Fuel Oil Co. v. Ins. Co. of North America,* 95 *N.J.Super.* 564 (App.Div.1967); *Deodato v. Hartford Ins. Co.,* 143 *N.J.Super.* 396 (Law Div.1976). The policy is clear and unambiguous and will not be rewritten to provide a better or different contract

of insurance in order to afford coverage. *Linden Motor Freight Co. v. Travelers Ins. Co.*, 40 *N.J.* 511, 525 (1963); *Petronzio v. Brayda,* 138 *N.J.Super.* 70, 75 (App.Div.1975). [*Id.* at 53–54].

▮ Here, KMSM similarly was charged with a negligent failure to investigate and, on that basis, seeks coverage under the policy issued by Atlantic Mutual. Although this alleged misfeasance may have occurred prior to the sale of the condominium units, the negligence for which the policy provided coverage did not take place until plaintiffs in the underlying action were damaged. This occurred when the problems with the defective heating system became so severe that the purchasers were forced to install a new heating system. In this regard, paragraphs 52 and 54 of the second amended complaint are enlightening:

52. Subsequent to closing of title of each condominium unit owned by plaintiffs, respectively, and without disclosure of the defective heating system by defendants, the heating system in fact, failed, rendering the condominium units uninhabitable and causing plaintiffs to suffer damages.

\*       \*       \*       \*       \*       \*       \*       \*

54. *Plaintiffs did not discover the latent defect within the heating system or its severity until September of 1981.* (Emphasis supplied).

Thus, at the time that the purchasers of the condominiums were harmed and KMSM's liability accrued, the insurance policy was no longer in effect. Just as the *Middle Dept. Insp. Agency* court denied coverage in that case, so we deny coverage here.

However, KMSM suggests that the damage did not take place on the date that it was discovered but rather "progress[ed] continuously throughout the policy period." In its brief, KMSM cites *CPS Chem. Co., Inc. v. Continental Ins. Co.,* 199 *N.J.Super.* 558, 566 (Law Div.1984), rev'd on other grounds 203 *N.J.Super.* 15 (App.Div.1985), for the proposition that the "[t]ime of discovery of the accident does not determine when it took place." On this basis, KMSM argues that there was an occurrence within the period that the policy was in force.

The corrosion of the pipes culminating in the need to replace the heating system was a gradual process. However, if it is this process, and not the time that the purchasers of the condominiums determined that the pipes had deteriorated so badly that the system had to be converted, upon which KMSM relies in seeking coverage, then KMSM's knowledge of the corrosion precludes it from being deemed an occurrence.

There was ample evidence that KMSM had prior knowledge of the deterioration of the heating system at the Bienvenue Condominiums. GMS had taken over the management of these condominiums in December 1975. The February 1978 report on the Bienvenue Condominiums prepared for Commonwealth by GMS states, in part, that "the heating system is in a steady state of deterioration and the maintenance over the coming years will become an unbearable burden." Moreover, the minutes of the March 31, 1979 board meeting of the condominium association indicate that Schoenleber presented the remains of a corroded pipe from the Bienvenue heating system. Additionally, the minutes state that:

> Mr. Schoenleber informed the members that *the potential exists here at Bienvenue for a major catastrophe with the underground heating pipes.* It appears that chemicals in the soil combine with the insulation surrounding the pipes, causing the pipes to corrode at an unusually fast rate of speed. In order to prevent this, or at least slow down the rate of corrosion, a cathodic specialist is being called in to inspect the pipes and make the necessary recommendations. (Emphasis supplied).

Even though KMSM might have been able to claim it was unaware that the problem at the Bienvenue Condominiums was so severe that the entire heating system would have to be replaced, it cannot colorably argue that it was unaware of the corrosion *process.* Thus, the very theory which enables KMSM to assert a claim within the period of coverage, precludes it from asserting that it was ignorant of the underlying problem. Clearly, KMSM knew that the pipes were corroding. Since one of the definitional requirements of an occurrence is that the insured's personal injury, property damage or advertising liability be "neither expected nor intended from the standpoint of the

insured," the process by which the heating system at Bienvenue corroded did not constitute an occurrence under the policy.

Thus, we hold that KMSM's alleged negligent failure to investigate was not an occurrence within the meaning of the policy. In reaching this conclusion, it is not necessary to determine nor do we determine the time of the occurrence. Rather, our decision rests on the established principle that an act of negligence committed by an insured does not trigger coverage until a party is damaged by such negligence. Here, no harm was sustained by the condominium purchasers until after the units had been sold and the insurance on them canceled. Likewise, we base our holding on the fact that the process of corrosion at the Bienvenue Condominiums was not unintended or unexpected by KMSM and, thus, was not an occurrence under the policy.

Accordingly, the judgment under review is reversed and judgment is entered in favor of Atlantic Mutual declaring that it is under no duty to provide a defense or indemnify plaintiffs in connection with the underlying civil litigation.