Josephine VARGAS, Martin Ellerbee, Marion Gargiulo, Joann Wheeler, Janice Sellers, Maria Rivera, Margarita Gonzalez, Plaintiffs,

v.

Christine CALABRESE, individually and in her official capacity as former Chairperson of the Hudson County Board of Elections, Frank Caleca, Lee S. Lichtenberger, the Hudson County Superintendent of Elections, Harvey L. Birne, as Hudson County Superintendent of Elections, Gerald McCann, individually and in his official capacity as former Mayor of the City of Jersey City, Matthew Burns, John Finn, Mark Munley, Defendants,

Gerald McCANN, Mark Munley, John J. Finn, Matthew Burns, Defendant Third-party Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Third-party Defendant.

Gerald McCANN, Defendant Third-party Plaintiff,

v.

J.R. INSURANCE BROKERAGE, INC., Third-party Defendant.

Civ. A. No. 85–4725.

United States District Court, D. New Jersey.

June 1, 1989.

Joseph Healy by Joseph Healy, Jersey City, N.J., for defendant third-party plaintiff Gerald McCann.

Robinson, Wayne & LaSala by Dorothy J. Nemetz, Newark, N.J., for defendant third-party plaintiff Matthew Burns.

Bruinooge & Associates by Thomas H. Bruinooge, John Patrick Oroho, Rutherford, N.J., for defendant third-party plaintiff Mark Munley.

Williamson & Rehill by Donald J. Williamson, Westwood, N.J., for defendant third-party plaintiff John J. Finn.

Garrity, Fitzpatrick, Graham, Hawkins & Favetta, P.A. by Walter J. Krako, Anthony J. Marino, Bloomfield, N.J., for third-party defendant Nat. Union Fire Ins. Co. of Pittsburgh, Pa.

Sheehy & Sheehy by John J. Sheehy, Jersey City, N.J., for J.R. Ins. Brokerage Co.

## OPINION

DEBEVOISE, District Judge.

This matter involves motions by defendant third-party plaintiffs Gerald McCann, Mark Munley, John J. Finn and Matthew Burns against third-party defendant National Union Fire Insurance Company of Pittsburgh, PA ("NUFI") for summary judgment pursuant to Fed.R.Civ.P. 56 or, alternatively, for a declaratory judgment pursuant to Fed.R.Civ.P. 57 that NUFI is obligated to defend and indemnify them in this action. NUFI, in turn, cross-moves for summary judgment as to McCann, Munley, Finn and Burns, or seeks, in the alternative, a declaratory judgment that it has no obligation to defend or indemnify the defendant third-party plaintiffs. In addition, third-party defendant J.R. Insurance Brokerage, Inc. ("J.R.") moves for summary judgment on defendant third-party plaintiff McCann's complaint against it and McCann, in turn, cross-moves for summary judgment against J.R. Burns opposes J.R.'s motion for summary judgment.

## I. Introduction

This case involves the interpretation of a standard broad form comprehensive general liability insurance policy that was apparently drafted to cover commercial risks and in this case issued by the insurer to cover the activities of three political organizations associated with the reelection of Gerald McCann as Mayor of Jersey City. The parties' arguments seemingly present the court with a choice between the defendant third-party plaintiffs' tortured interpretation of the policy provisions and the third-party defendant insurer's strictissimi juris approach to the same language and rather disingenuous protestations that it did not have complete knowledge of the insureds' activities. This case is admittedly a close one and for that reason alone, if no other, favors the insureds.

## II. Background of the Dispute

In April 1985, Mayor Gerald McCann of the City of Jersey City ran for reelection against Anthony Cucci and two others. No candidate obtained a majority of the votes cast. Under the laws governing mayoral contests in Jersey City, a run-off election was scheduled in June between the two highest vote getters, McCann, who received 46% of the vote and Cucci who received 49%.[1]

Cucci apparently enjoyed broad-based support among the black and Hispanic neighborhoods in the city. The complaint alleges that in preparation for his rematch with Cucci, McCann with the advice of Finn, who was brought in as a consultant to the campaign, and Munley, who was then the city Director of Housing and Economic Development, developed a strategy to undercut Cucci's strength that would impede or prevent voting in the election districts in neighborhoods that were heavily black or Hispanic.

In general the plan, by design or in effect, had six major components, in which

---

1. The June election also included councilmanic run-off elections between candidates affiliated with the major mayoral candidates and others.

some or all of the defendant third-party plaintiffs involved in this motion are alleged to have participated. First, letters were forwarded to residents of public housing projects tenanted by blacks and Hispanics informing them unless their names appeared on their apartment leases they would be unable to vote and would be prosecuted for doing so. Second, some five to six thousand names were placed on the challenge list without notification to these individuals and despite the fact that, although the list was purportedly drawn from the names of voters whose sample ballots had been returned as undeliverable, some of the listed individuals received sample ballots at their home addresses.

Third, by virtue of his position as Chairman of the Hudson County Democratic Party, McCann was permitted in practice to select election district members who would, among other things, serve as challengers in the local polling places. McCann used this privilege to appoint off-duty Jersey City policemen to this function in heavily black and Hispanic voting districts. These officers allegedly harassed eligible voters and prevented them from casting ballots. Fourth, instructions were provided to all district board members directing them to prevent any individual whose name appeared on the challenge list from voting unless the voter produced a current lease, if the voter was a resident in public housing, or a phone, gas or electric bill in the voter's name.

Fifth, color-coded lists of names used to challenge prospective voters on the basis of race were allegedly prepared and sixth, there was a failure to provide adequate bilingual assistance both at polling places and at the courthouse for those individuals that attempted to obtain court orders permitting them to vote.

Finn allegedly authored and distributed the instruction sheet for all McCann campaign workers instructing them to accept only utility bills, or for individuals in public housing, only a current lease displaying the voter's name. These instructions conflicted with normal voting procedures used in the county. With Munley, Finn is also alleged to have held training sessions with the McCann-appointed election district board members. Burns served as counsel to the campaign and allegedly coordinated the work of campaign workers who procured documentation of voter fraud and the use of police officers to serve as district election board members in black and Hispanic neighborhoods.

Plaintiffs are a class of black and Hispanic voters who were allegedly prevented or discouraged from voting in the June 11, 1985 run-off election. In addition to the factual averments recited above, their second amended complaint sets out no fewer than thirteen separate causes of action arising under the Ku Klux Klan Act of 1861, 42 U.S.C. sec. 1983, the Civil Rights Act of 1866, 42 U.S.C. sec. 1985, and the Voting Rights Act of 1965, 42 U.S.C. sec. 1971 *et seq.* Plaintiffs seek equitable, declaratory and compensatory relief. In an opinion and order entered on May 14, 1986, I certified the plaintiff class. *Vargas v. Calabrese,* 634 F.Supp. 910 (D.N.J.1986).

Other individuals initially joined as defendants, members of the Hudson County Board of Elections, were dismissed on motions for summary judgment on various dates. As this rather involved case lumbers on toward the four-year milestone, the remaining defendants and the insurer have obviously started to reflect on the possibility of settlement and/or become anxious about who will end-up paying the judgment if one is ultimately entered in plaintiffs' favor. I turn now to consideration of the events that led up to the purchase of the insurance policy and the policy itself.

### III. The Insurance Policy

In the summer of 1984 McCann and his supporters formed an entity which they named the "Democratic Dinner Committee, Fall 1984." Burns served as treasurer of this committee. In the late summer or early fall of 1984, two additional committees were formed, "Professionals for McCann, Inc.", which was an incorporated group organized to raise funds and generate support among city professionals, and "McCann in 85", which was apparently the

major organizational group for the McCann campaign. Burns was an incorporator and trustee of the first group and sometime counsel to the second, in each case as a volunteer.

On August 1, 1984, Jay Hamill an associate at the law firm of Keane, Brady & Hanlon, where Burns worked and who was, like Burns, providing volunteer legal services to the McCann campaign, wrote to Robert Feely of J.R. asking that Professionals for McCann be added as an additional insured to an existing insurance policy covering the Democratic Dinner Committee, Fall 1984. In December 1984 Hamill requested that Feely also add the McCann in 85 group as an additional insured under the same policy.

In November 1984 Feely apparently advised Hamill that it would be beneficial to obtain a new policy covering all three organizations. Hamill concurred and authorized Feely to obtain a new policy. Hamill stated the he told Feely that wanted a "policy that covered everybody who worked on the campaign for anything that arose out of the campaign." Oroho Affidavit Exhibit A, Hamill Deposition at 20, 23. Hamill wrote an interoffice memorandum to Burns noting that the new policy's coverage limit was $1,000,000 and that the new policy "broadens the coverage somewhat." *See* Burns Affidavit, Exhibit 4.

Feely went to Edward Johnson of Johnson Excess, Ltd. to obtain underwriting. Under a managing general agency agreement with NUFI, Johnson Excess was permitted to write up to $1,000,000 of General Comprehensive Liability coverage on behalf of NUFI. Williamson Affidavit Exhibit 13, Johnson Deposition at 83; Oroho Affidavit Exhibit L, General Agency Agreement, Addendum A. Johnson and his underwriter, Daniel Winneg, wrote a General Comprehensive Liability policy with a Broad Form Endorsement. Johnson states in his affidavit that he understood that the policy would cover volunteers and that the insured organizations would be engaged in attempting to raise money and garner votes. Williamson Affidavit Exhibit 13, Johnson Deposition at 46, 61, 65. Johnson characterized the resulting policy and endorsement as the broadest coverage that Johnson Excess was permitted to write under the terms of the Johnson Excess–NUFI managing general agent agreement. *Id.* at 120. Since there were no established ratings for this risk and since Johnson Excess was apparently limited to the use of a form policy, the risk was analogized to that of a sales and service organization for purposes of setting a premium. *Id.* at 92, 94, 97. After the policy was drawn up it was forwarded to NUFI for review according to the terms of Johnson Excess' underwriting agreement. NUFI received and reviewed the policy, but did not make any comments to Johnson Excess or direct Johnson Excess to issue a notice of cancellation. *Id.* at 45; Williamson Affidavit Exhibit 14, NUFI's Response to Requests for Admission No. 18.

NUFI Policy No. S995–62–22 was issued on December 26, 1984 and made effective retroactively to November 15, 1984 for the named insureds Democratic Dinner Committee of 1985 and Professionals for McCann, and, by a later endorsement on March 3, 1985, to the Democratic Dinner Committee, Fall 1984.

The amendatory endorsement to the policy limits coverage to $1,000,000 for each occurrence and aggregate of bodily injury and property damage. The policy defines "bodily injury" as

bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom …

"Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended from the standpoint of the insured*." (emphasis supplied).

The Broad Form Comprehensive General Liability Endorsement provides in part:

II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE

(A) The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as

damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Advertising and personal injury are defined as follows:

"Advertising injury" means injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan. "Personal injury" means injury arising out of one or more of the following offenses committed during the policy period:

1. false arrest, detention, imprisonment, or malicious prosecution;

2. wrongful entry or eviction or other invasion of the right of private occupancy;

3. a publication or utterance

(a) of a libel or slander or other defamatory or disparaging material, or

(b) in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the the named insured shall not be deemed personal injury.

By letter dated February 14, 1985, Feely transmitted the new policy to Hamill. As the mayoral election approached, Burns asked Hamill to clarify that the policy covered all campaign workers and any actions for libel and slander. Burns Affidavit Exhibit 8 (memorandum from Burns to Hamill). Hamill states that he called Feely and that Feely assured him that libel and slander would be covered and that the policy would cover "all individuals working on the campaign." Oroho Affidavit Exhibit A, Hamill Deposition at 33–34.[2] Hamill then wrote Feely stating that it was his understanding that "[libel] and slander are covered by this policy for those who are working for the covered committees and performing services related thereto" and that the policy "covers all individuals working on the campaigns which involve the covered committees." If either of these assertions were "inaccurate or incomplete", Hamill advised Feely to contact him. Burns Affidavit, Exhibit 9.

Feely substantially corroborates Hamill's account. He states in an affidavit that Hamill called him on March 5, 1985 to confirm that the policy covered actions for libel and slander and Hamill told him the policy did provide that coverage. Feely said that Hamill sent him a letter dated on March 5th "confirming" that understanding and "reaffirm[ing] our understanding that the policy would cover all individuals working on the campaign." Feely Affidavit, paras. 9, 10.

Burns states in his affidavit that in addition, "sometime in January or February of 1985" he spoke with Feely on the phone on "one or more occasions" and asked whether the policy would provide coverage for "claims of civil rights violations." Burns Affidavit para. 10. Burns states that Feely reported to him that "the policy did provide such coverage." *Id.* Feely neither confirms nor denies Burns' account.

### IV. Discussion

Summary judgment is only appropriate where the moving party establishes that

---

**2.** Feely's statements are admissible as admissions by a party-opponent under Fed.R.Evid. 801(d)(2)(D).

"there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g.* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.) *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). The Supreme Court has explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 574, 106 S.Ct. at 1348. All evidence must be viewed in a light most favorable to the party opposing the motion. *Wahl v. Rexnord*, 624 F.2d 1169, 1181 (3d Cir.1980). When ruling on a summary judgment motion the court must also consider the relevant burdens of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). These standards will be applied to the instant motions.

In construing matters of state law in pendent claims or in state law matters otherwise subsidiary to its federal question jurisdiction, a federal court exercising federal question jurisdiction, like a federal court sitting in diversity, is duty-bound to apply the law of the state in which it sits. *See Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540–41 n. 1 (2d Cir.1956) ("... it is the *source* of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law.") (emphasis by the court); *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 915 (9th Cir.

1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). The parties agree that New Jersey law governs the interpretation of the policy.

Under New Jersey law, whenever a complaint against an insured falls within the parameters of coverage, the insurer must provide a defense. *Ohio Casualty Ins. Co. v. Flanagin*, 44 N.J. 504, 512, 210 A.2d 221 (1965); *Danek v. Hommer*, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), *aff'd*, 15 N.J. 573, 105 A.2d 677 (1954). The complaint must "be laid along side the policy and the test is whether the allegations of that complaint, upon its face, fall within the risk insured against." *Ohio Casualty, supra*, 44 N.J. at 512, 210 A.2d 221; *see also Sandoz, Inc. v. Employers Liability Assurance Corp.*, 554 F.Supp. 257, 267 (D.N.J.1983); *Danek, supra*, 28 N.J.Super. at 77, 100 A.2d 198; *Deodato v. Hartford Ins. Co.*, 143 N.J.Super. 396, 400–01, 363 A.2d 361 (Law Div.1976), *aff'd*, 154 N.J.Super. 263, 381 A.2d 354 (1977). New Jersey courts have long held that when a dispute as to coverage arises, insurance policies "should be construed liberally in ... favor [of the insured] to the end that coverage is afforded 'to the full extent that any fair interpretation will allow'". *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 482, 170 A.2d 22 (1961), *quoting Danek, supra*, 28 N.J.Super. at 76, 100 A.2d 198.

Courts that have for decades strained to give reasonable meaning to ambiguous terms selected by insurers have taken to resolving these ambiguities against the drafters. *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406 (1985). The New Jersey Supreme Court has consistently ruled that ambiguities in insurance contracts are to be interpreted in accord with the "reasonable expectations of the parties." *E.g., Werner Indus., Inc. v. First State Ins. Co.*, 112 N.J. 30, 35, 548 A.2d 188 (1988); *Meier v. New Jersey Life Ins. Co.*, 101 N.J. 597, 611–12, 503 A.2d 862 (1986); *Sparks, supra*, 100 N.J. at 338, 495 A.2d 406; *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 320–21, 495 A.2d 395 (1985); *DiOrio v. New Jersey Manuf. Ins. Co.*, 79 N.J. 257, 269, 398 A.2d

1274 (1979); *Gerhardt v. Continental Ins. Cos.*, 48 N.J. 291, 291, 225 A.2d 328 (1966); *Allen v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 305, 208 A.2d 638 (1965); *Kievit, supra,* 34 N.J. at 482–83, 170 A.2d 22. This precept evolved from the view that insurance policies are often contracts of adhesion between parties with uneven bargaining power that do not result in a "meeting of the minds." *See, e.g., Meier, supra,* at 611–12, 503 A.2d 862.

> By traditional standards of contract law, the consent of both parties, based on an informed understanding of the terms and conditions of the contract, is rarely present in insurance contracts.... Because understanding is lacking, the consent necessary to sustain traditional contracts cannot be presumed to exist in most contracts of insurance. Such consent can be inferred only to the extent that the policy language conforms to public expectations and commercially reasonable standards.... In instances in which the insurance contract is inconsistent with public expectations and commercially accepted standards, judicial regulation of insurance contracts is essential in order to prevent overreaching and injustice.

*Sparks, supra,* 100 N.J. at 338, 495 A.2d 406 (citations omitted).

This principle is most frequently invoked in cases involving the interpretation of an insurance policy issued to a consumer. Unequal bargaining power occurs between insurance companies and corporations and organizations as well, however. In policies covering corporations and organizations, as well as those covering consumer risks, insurance companies "possess all the expertise and unilaterally prepare the varied and complex insurance policies," *Meier, supra,* 101 N.J. at 612, 503 A.2d 862. Small concerns and organizations cannot be expected to master the arcane art of risk coverage and lack the leverage to induce the large insurance corporations to write policies customized to cover specific risks. For these entities, insurance coverage is still a "take-it-or-leave-it proposition." *Meier, supra,* 101 N.J. at 611 n. 10, 503 A.2d 862. Accordingly, New Jersey courts have applied the principle of reasonable expectations to commercial policies. *E.g., Killeen Trucking, Inc. v. Great Am. Surplus Lines Ins. Co.*, 211 N.J.Super. 712, 512 A.2d 590 (App. Div.1986). Although there are corporations that stand on equal footing with insurers and for whom the principle of reasonable expectations should not be applied, *see McNeilab, Inc. v. North River Ins. Co.*, 645 F.Supp. 525, 546–47 (D.N.J.1986), *aff'd mem.,* 831 F.2d 287 (1987) (refusing to apply reasonable expectations principle where insured was larger than insurer because principle was founded on presumption of disparate bargaining power), the McCann campaign organizations certainly do not fit within this description.

Ambiguity may result from the use of an overly broad term or industry argot, but it is just as often a question of context. As the Appellate Division has observed, the reasonable expectations standard evolved from cases where "the insurance policy was ambiguous, either as drafted *or as applicable to a particular factual setting.*" *MacBean v. St. Paul Title Ins. Co.*, 169 N.J.Super. 502, 507, 405 A.2d 405 (App. Div.1979) (emphasis added). Terms familiar in one context may be alien in another. The New Jersey Supreme Court has recently interpreted the principle of reasonable expectations as a basic tenet of insurance law that applies to the interpretation of policies "regardless of the existence of any ambiguity in the policy ..." *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 338, 495 A.2d 406 (1985). Thus, "even an unambiguous contract [may be] interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured...." *Werner Indus., supra,* 112 N.J. at 35–36, 548 A.2d 188. The New Jersey courts engage in a sweeping inquiry in divining the reasonable expectations and intentions of the contracting parties. The courts refer to the apparent object of the policy, the context of the policy including subject matter and nature of the risk, and the circumstances surrounding the making of the policy. *See Boswell v. Travelers Indem. Co.*, 38 N.J.Super. 599, 604–05, 120 A.2d 250 (App.Div.1956); *Kook v. American Surety*

*Co. of New York,* 88 N.J.Super. 43, 53, 210 A.2d 633 (App.Div.1965); *Tooker v. Hartford Acc. & Indem. Co.,* 128 N.J.Super. 217, 222–23, 319 A.2d 743 (App.Div.1974) (broad search into probable intent and general purposes); *American Home Assurance Co. v. Hartford Ins. Co.,* 190 N.J.Super. 477, 484, 464 A.2d 1128 (App.Div.1983) (common intent and general purposes); *Doria v. Insurance Co. of No. America,* 210 N.J.Super. 67, 509 A.2d 220 (App.Div.1986) (same); *Kelly, Messick, Schoenleber & Miller Assocs. v. Atlantic Mut. Ins. Co.,* 218 N.J.Super. 395, 404, 527 A.2d 946 (App. Div.1987) (same).

Defendant third-party plaintiffs make essentially two arguments for coverage. They argue first that the terms of the policy standing alone are sufficiently broad to cover the allegations of plaintiff's second amended complaint. Although the terms per se are not completely recondite, neither are they models of clarity. However, defendant third-party plaintiffs' efforts to twist the language of the policy and the theory of plaintiffs' case to support an interpretation favorable to their position are ultimately unpersuasive. The second argument made by the insureds is that the policy terms are ambiguous in the context of the covered risk and that an inquiry into the reasonable expectations of the parties demonstrates that broad coverage was intended.

I consider these arguments in the context of the following three issues: (1) whether the policy extends coverage to civil rights actions, (2) whether the policy covers "intentional acts", and (3) whether the four defendant third-party plaintiffs who have brought the present motions are insureds under the policy.

*1. Coverage of Civil Rights Actions*

██ Defendant third-party plaintiffs argue that the second amended complaint actually states a claim for negligent infliction of emotional distress which is covered under the "bodily injury" policy provisions. In support of this assertion, the movants rely on language in the complaint that describes the representative class members as having been "embarrassed" and "humil-iated" after having been prevented from voting.

It is true that New Jersey recognizes a cause of action for emotional distress and that state courts have interpreted insurance policies providing coverage for "bodily injury" as providing coverage for emotional distress actions. *NPS Corp. v. Insurance Co. of No. Amer.,* 213 N.J.Super. 547, 554, 517 A.2d 1211 (App.Div.1986); *Wolfe v. State Farm Ins. Co.,* 224 N.J.Super. 348, 352, 540 A.2d 871 (App.Div.), *certif. denied,* 111 N.J. 654, 546 A.2d 562 (1988). It is not immediately clear, however, that New Jersey recognizes an action for emotional distress that is wholly independent of any physical injury, or, if it did, whether it would necessarily find that a "bodily injury" provision extended to such an action.

More to the point is the fact that plaintiffs' allegations simply cannot be reduced to simple cause of action for "emotional distress". Even a casual reading of the complaint demonstrates that the essence of this action is to redress the deprivation of constitutionally-secured voting rights. This action is without an analogue in the body of state common law tort. *See Howell v. Cataldi,* 464 F.2d 272, 278 (3d Cir. 1972) (not all constitutional claims are *in pari materia* with state common law tort actions).

Defendant third-party plaintiffs' heavy reliance on *Newark v. Hartford Accident and Indem. Co.,* 134 N.J.Super. 537, 342 A.2d 513 (App.Div.1975) is misplaced. In that case, the police department of the City of Newark was a named insured on a liability policy issued by an insurer which provided coverage for certain intentional torts. Several Newark police officers were made defendants in an action brought under 42 U.S.C. sec. 1983 alleging, among other claims, illegal detention and assault and battery. The Appellate Division rejected the insurer's contention that it was not obligated to defend the case because civil rights actions were not explicitly covered under the policy:

> The claims asserted in the federal action under the Civil Rights Act are covered by the insurance policy to the extent that

they are "offenses" mentioned in the policy and allege common law torts under state law—e.g., false arrest, detention or imprisonment, malicious prosecution and assault and battery—even though recovery is sought under the federal act and in the federal court. The carrier could have excluded from coverage civil rights actions but it did neither.

134 N.J.Super. at 544–45, 342 A.2d 513. The court ruled that the carrier's duty to defend should be determined by comparing "the torts alleged in the federal complaint with the 'offenses' (i.e., torts) listed in the coverage provisions of the policy." *Id.*

In *Newark* the underlying offense was one of false arrest and assault and battery. Although these acts gave rise to a valid federal cause of action, they could also be redressed under state law and as state tort claims they would unquestionably be covered under the policy provisions. What the *Newark* court held is that an insurer could not take advantage of the plaintiff's preference for a federal cause of action to disclaim coverage when it was clear that the federal and state law remedies covered the same offenses and required similar proofs. Although the acts alleged could have been couched as common law torts, they also amounted to violations of constitutional rights.

In this case, however, there is no correlative state law cause of action and the particular offense, infringement of voting rights, was not one of the offenses explicitly covered in the policy. A cause of action for emotional distress does not a voting rights deprivation make. The two actions require disparate proofs and claim substantially different injuries.

Nor can it be said that the acts alleged in plaintiffs' complaint are covered within the term "personal injury." Defendant third-party plaintiffs argue that the fact that plaintiffs were "delayed" in their attempts to vote means that they were victims of unlawful detention and false arrest, but this is obviously a strained reading of the personal injury provisions. Neither can it be credibly asserted as a matter of construction that the second amended complaint states a claim for slander or libel.

Defendant third-party plaintiffs' attempt to force the breadth of coverage they seek into the constrained and ambiguous terminology of the policy is ultimately unconvincing as a semantic exercise. Although the terms, considered by themselves, are somewhat ambiguous, they are not so ambiguous to admit of the meaning defendant third-party plaintiffs ascribe to them.

■ However the terms are ambiguous in the context of a political campaign. In this case, the underwriter issued a conventional, general liability commercial policy to cover the rather unique risks inherent in a political campaign. The policy is denominated "comprehensive" yet speaks in terms relevant primarily to commercial risks such as "bodily injury," "personal injury," "advertising injury," and "false arrest." Obviously these terms, and the others used in the policy, are not wholly without relevance to certain phases of campaign activity, but when pressed into service to cover campaign activities like those at issue in this case, such as electioneering and voter challenging, they become ambiguous. It is therefore appropriate to move to defendant third-party plaintiffs' second argument and to inquire into the reasonable expectations of the parties when they entered into the contract for insurance.

That it was a reasonable expectation for the insureds to believe that policy coverage extended to civil rights actions is demonstrated by the nature of the discussions between the campaign counsel and the insurance broker and the expecatations of the broker and insurer themselves. Hamill, acting as counsel for the McCann campaign told Feely of that he wanted a "policy that covered everybody who worked on the campaign for anything that arose out of the campaign." Oroho Affidavit Exhibit A, Hamill Dep. at 23. Feely, in turn, sought a "General Comprehensive Liability" policy from Johnson Excess for the three McCann political organizations, aware that they were engaged in political fund-raising and campaigning and aware that the policy was to cover the activities of

the many campaign volunteers who worked for the various organizations. Feely affidavit, paras. 9, 10. According to Johnson of Johnson Excess, Feely communicated these expectations to him and Johnson accordingly obtained the broadest coverage available under his firm's managing general agent agreement with NUFI:

A. Based on my notes Mr. Feely described the exposure as a campaign office and a reelection campaign for Gerald McCann. *And he asked for general liability coverage to cover these entities including comprehensive general liability including broad form.*

Q. What do you mean by "including broad form."

A. Broad form is an endorsement which is in the policy which provides the *broadest available general liability coverage available for risk as far as this carrier is concerned.*

. . . . .

Q. Now, Mr. Johnson, in your conversation with Mr. Feely prior to your developing the rating for this coverage, did Mr. Feely inform you as to what type of business or what type of activities these committees were going to be involved in?

A. Specifically, other than generally saying that they were going to be working for the campaign to reelect Gerald McCann and *do normal things that reelection committees do,* we didn't go into any particular broad description of the activities that would be involved.

Q. Was it your understanding that the volunteers who worked for this campaign and participated in campaign activities would be covered under this policy?

A. Yes.

Q. What was your understanding . . . as to the activities that these various committees were going to be involved in?

. . . . .

A. *I was under the impression that these particular entities would be attempting to generate both funds for the campaign and votes for the candidate.* And as such [I] was not—I was not familiar with Jersey City politics at this point.

Williamson Affidavit Exhibit 13, Johnson Dep. at 46, 61, 65–66 (emphasis supplied).

Edward Rodriguez, then supervisor of NUFI's underwriting division and now its corporate secretary, similarly conceded that it was his understanding that the policy covered campaign workers in tasks such as answering phones, canvassing door to door, acting as advisors, supervising volunteers and working at election headquarters. Nemetz Affidavit Exhibit 1, Rodriguez Dep. at 64.

These statements by industry professionals familiar with the language and context of the policy at issue, the discussions between Hamill and Feely, the nature of the insured organizations and the impending election date support the view that it was reasonable to expect that this policy would be "comprehensive" in breadth of coverage. In the rough and tumble arena of Jersey City politics, it was not unforeseeable that the campaign organizations would be targets of litigation including civil rights actions.

*2. Coverage of Intentional Acts*

The policy itself does not apparently extend coverage to intentional acts; "occurrence" is defined as an "accident . . . neither expected nor intended from the standpoint of the insured." The Broad Form Comprehensive General Liability Endorsement by its own terms, however, "modifies such insurance as is afforded by the provisions of the [Comprehensive General Liability] policy." The endorsement extends coverage to claims for "personal injury," the definition of which encompasses various intentional torts such as false arrest, detention, imprisonment and malicious prosecution.

There is no explicit mention of civil rights actions in the language of the Endorsement. Here again, however, it is important to recall that this is a standard commercial insurance policy which has been pressed into service to cover the unique risks involved in a political campaign. In the course of its normal day-to-day activities, it would be reasonable to expect that a business, especially a store or

market, would face intentional tort actions such as those covered by the Endorsement. It would also be reasonable to expect that political campaign organizations would also be the target of intentional tort actions, although these might include, in addition to those listed above, civil rights actions. Since the typical commercial intentional torts are covered by the Endorsement, it would be a reasonable expectation to conclude that the intentional tort actions that would likely be lodged against a political campaign organization would also be covered by the policy.

The fact that civil rights actions are not included as intentional torts under the policy is not an obstacle to concluding that coverage exists, in light of the reasonable expectations of the parties.

*3. Which Defendant Third-party Plaintiffs are Insureds*

■ It is also clear that it was reasonable to expect that the coverage of the policy would extend broadly to all manner of campaign volunteers. The language of the policy and endorsement support this view. Section II(c) of the policy defines named insured as the organization designated in the declaration "and any executive officer, director or stockholder thereof while acting within the scope of his duties as such." Section X(B) of the endorsement broadens this coverage to included as "additional persons insured" "[a]ny employee (other than executive officers) of the named insured while acting within the scope of his duties as such ..."

The context of the negotiations and discussions between the insured and the insurer also support this interpretation. As indicated above, Hamill specifically sought coverage for volunteers and on at least one occasion sought Feely's assurances that the policy covered volunteer campaign workers. Feely assured him that coverage extended to everyone who worked on the campaign. Feely affidavit, para. 9. According to Johnson, the Broad Form Endorsement was added to the policy in order to expand coverage to include volunteers:

Q. Where in the Broad Form endorsement were campaign workers picked up?

A. In my opinion?

Q. Well, is that—did you indicate whether—

A. Under additional insured endorsement. I would add—

MR. OROHO: Section 10 of the [B]road [Form Endorsement?]

A. Yes.

Williamson Affidavit Exhibit 13, Johnson Deposition 118–19. Rodriguez also agreed the coverage as to volunteers was broad, *see* Nemetz Affidavit Exhibit 1, Rodriguez Dep. at 64, and stated specifically that he believed that coverage extended to Munley, Burns and Finn. *Id.* at 65–66.

The nature of the insured organizations themselves also supports the view that volunteers would be covered under the policy and endorsement. Political organizations are largely staffed and run by volunteers. NUFI was aware that the policy was written to cover political organizations, actively engaged in fund-raising and campaigning.

It is undisputed that Finn, Munley and Burns were campaign volunteers and as such, they are covered by the policy. Although there is no explicit provision that would extend coverage to the candidate himself, it is clear that his role is analogous to that of an executive director, who is covered under Section II(c) of the policy, since he had ultimate control over the activities of the campaign organizations. Technical arguments regarding whether one or another of the defendant third-party plaintiffs is or is not covered under the policy are simply not credible in light of the fact that the parties agreed that "all inclusive" coverage was the object of the policy. And where policy provisions include persons other than the named insured, these provisions should be broadly construed. *Mazzilli v. Accident & Casualty Insurance Co. of Winterthur*, 35 N.J. 1, 18, 170 A.2d 800 (1961); *Tooker, supra,* 128 N.J.Super. at 222–23, 319 A.2d 743. In summary, I conclude that Burns, Finn, Munley and McCann are "volunteers" covered both within the literal terms of the policy and within the reasonable expectations of the parties.

#### 4. The Extent of Coverage and Public Policy

A question which was not raised by any party but which merits consideration is whether permitting coverage of acts committed with actual malice or indemnifying punitive damages offends public policy.

The second amended complaint seeks punitive damages for alleged violations of plaintiffs' civil rights. Second Amended Complaint, Prayer for Relief, para. 5. Punitive damages may be awarded in order to punish violations of constitutional rights. *Newport v. Facts Concerts, Inc.,* 453 U.S. 247, 267, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981); *Carey v. Piphus,* 435 U.S. 247, 257 n. 11, 98 S.Ct. 1042, 1049 n. 11, 55 L.Ed.2d 252 (1978). Applying standard principles of insurance contract interpretation, it appears that the instant policy would be found to provide coverage for punitive damage awards. The policy is "comprehensive" in scope, covers claims for which punitive damages could be assessed and fails to exclude coverage for punitive damages as the insurer could have done.

It is possible that the courts of New Jersey would find that insurance coverage of a punitive damage award would violate public policy, however. In *Newark,* the facts of which were discussed at length in Section IV(A) above, the court considered whether an insurance policy covering intentional acts—including coverage of civil rights violations, as the court construed the policy—violates public policy. The court observed that insurance polices that indemnify for willful criminal acts or intentional injury have been found to conflict with public policy. But in the case before it the court observed that "other values are involved."

> The duty to defend and pay is limited to the specific intentional 'offenses' committed in the course of the policemen's 'business.' With appropriate further limitations, there would appear to be no public policy problem. Thus, for example, a

defense or indemnification should not be permitted for an act that constitutes a crime or involves actual malice or other outrageous conduct, or for an act outside the scope of the policemen's employment.

134 N.J.Super. at 546, 342 A.2d 513. The court concluded that indemnification of compensatory damages awarded for "offenses" covered by the policy where the injury was not intended, "only the probable result" of an intentional act, or within the scope of the officer's employement would not offend public policy. *Id.* at 547, 342 A.2d 513. However the court ruled that public policy "would plainly not permit a defense or indemnification by the carrier of any claim for punitive damages." *Id.*

The somewhat cryptic holding of *Newark* seems to be twofold. First, an insurer's coverage or defense of intentional acts is violative of public policy unless the breadth of coverage is limited by exclusion of criminal acts, exclusion of acts committed with actual malice or exclusion of acts outside the scope of the tortfeasors' employment. Second, coverage or defense of punitive damages is always against public policy. Although I do not have the benefit of research by the parties on this issue, *Newark* appears to be the leading, if not the only, New Jersey case on this point.[3] Although this issue has not apparently been addressed by the state supreme court or at length by any other court, there is no obvious reason to question the continued viability of this holding.

The application of *Newark* to the facts of this case is necessarily somewhat uncertain. The policy in question contains a limitation not unlike the limitation in the policy discussed in *Newark.* Under Section II(c) of the Policy and Section X(B) of the Endorsement, coverage is extended only to acts that occurred while defendant third-party plaintiffs were acting within the scope of their employment. Assuming for purposes of argument that this limitation meets the requirements of *Newark* (as it seems to), since there have been no factual conclusions regarding what wrongs the de-

---

**3.** The Court of Appeals for the Third Circuit has concluded that under New Jersey law, public policy permits a municipality to indemnify its police officers in a civil rights action. *Skevofi-*

*lax v. Quigley,* 810 F.2d 378, 386–87 (3d Cir. 1987). Punitive damages were not awarded in that case, however. *Id.* at 379.

**726**

fendant third-party plaintiffs committed, if any, it is premature to decide at this point whether *Newark* limits coverage in any way.

In this situation the best course may be to permit the individual plaintiff third-party defendants to continue to be represented by their current counsel and to permit the insurer's attorney to protect its interests under the policy. After the trial is concluded, the remaining questions regarding coverage can be resolved. *See Newark, supra,* 134 N.J.Super. at 549, 342 A.2d 513; *Barton v. Gulf States Entertainment,* 655 F.Supp. 782, 786–87 (M.D.La.1987) (postponing question of whether policy covers punitive damages and public policy issues until after trial on the merits). If punitive damages are not ultimately awarded at least some of these issues will disappear.

### V. McCann's Third–Party Action against J.R.

On April 28, 1988 the magistrate signed an order permitting defendant McCann to amend his third-party complaint to add J.R., the insurance broker who obtained the policy, as a third-party defendant. McCann's complaint against J.R. recites the fact that NUFI disclaimed coverage of the present suit under the policy and alleges that J.R. was therefore negligent in failing to obtain the coverage requested on behalf of McCann. J.R. now moves for summary judgment on McCann's third-party complaint and McCann cross-moves for summary judgment against J.R.

The resolution of the motions for summary judgment between defendant third-party plaintiffs and NUFI make it unnecessary for me to consider the arguments made by McCann and J.R. Since I have concluded that defendant third-party plaintiffs, including McCann, are covered by the policy in question, there is no longer a viable negligence claim against J.R. McCann's motion for summary judgment on its third-party complaint against J.R. is therefore denied and J.R.'s motion for summary judgment is granted.

### VI. Conclusion

The insurance agency, the insurance broker and the insurer all understood the general nature of the coverage sought by the McCann political organizations and the types of risks involved. In light of this, the broadest coverage the broker could write on behalf of NUFI under its agency agreement was obtained. However, despite the fact that both the insurer and the broker were aware of the unique risks involved, this coverage was provided within the context of a standard commercial form policy. The nature of the insured organizations themselves and of the circumstances surrounding the procurement of the policy demonstrate beyond doubt that both parties to the insurance contract reasonably expected that broad coverage would be provided to the political activities pursued by the insured organizations and that this coverage would extend to civil rights actions. It is these expectations and not the constrained, inappropriate language of the contract—language chosen by the insurer—that governs the question of whether or not coverage should be provided.

In this case it is clear that coverage for the civil rights actions lodged by the plaintiffs exists under the policy. NUFI raises no genuine issue of material fact that would point toward a contrary result. For the reasons discussed above in Section IV, therefore, the motions for summary judgment of third-party plaintiffs McCann, Munley, Finn and Burns are granted with respect to NUFI as to the duty to defend and indemnify plaintiffs' claims regarding civil rights violations and intentional acts. Defendant third-party plaintiffs' motion for summary judgment is denied with respect to NUFI's duty to defend or indemnify on the issue of punitive damages. NUFI's cross-motion for summary judgment against the third-party plaintiffs is denied. For the reasons discussed above in Section V, third-party plaintiff McCann's motion for summary judgment on its third-party complaint against J.R. is denied and J.R.'s motion for summary judgment is granted. The court will enter its own order.