ETHICON, INC., Plaintiff,

v.

The AETNA CASUALTY AND SURETY CO., Defendant.

No. 85 Civ. 7640 (PKL).

United States District Court,
S.D. New York.

May 24, 1990.

---

Patterson, Belknap, Webb & Tyler, New York City (David Dobbins, Robert P. LoBue, John Harris, Rhonda Brown, of counsel), for plaintiff.

Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y. (Howard J. Newman, Frank J. Giliberti, Daniel Gammerman, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge.

This is a diversity action involving the extent, if any, of the liability of defendant Aetna Casualty and Surety Company ("Aetna") to plaintiff Ethicon, Inc. ("Ethicon"), under insurance policies issued by Aetna. Ethicon seeks indemnification for moneys paid in satisfaction of an $18,900,-000 judgment rendered against it in an antitrust action entitled *Handgards, Inc. v. Ethicon, Inc.*, 552 F.Supp. 820 (N.D.Cal. 1982), *aff'd*, 743 F.2d 1282 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). Aetna denies that the amount at issue is covered by the applicable policies and refuses to indemnify Ethicon. The parties are now before the Court on plaintiff's motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff asserts that it should be indemnified for the judgment in the *Handgards* action, and that indemnification should be had on the 1967 policies between the parties, as well as the 1961 policy. For the reasons stated below, plaintiff's motion for partial summary judgment is granted in part.

## BACKGROUND [1]

Plaintiff Ethicon is a wholly-owned subsidiary of Johnson & Johnson. Ethicon manufactures, sells and distributes hospital and surgical supplies, including, until 1969, disposable plastic gloves adhered to paper, which were manufactured and distributed by its Arbrook division. In 1969, Arbrook

became a subsidiary of Johnson & Johnson, separate from Ethicon. It is Arbrook's product, the disposable plastic glove adhered to paper, that is the underlying subject of the instant litigation.

In 1957, the Scott Company ("Scott"), located in Omaha, Nebraska, began manufacturing and selling disposable plastic gloves. One of Scott's founders, Joseph C. Gerard ("Gerard"), applied for a patent for the process used by Scott to manufacture the disposable plastic gloves on June 2, 1958. In 1961, Ethicon acquired the assets of Scott, including Gerard's patent rights. On April 3, 1962, Ethicon received patent No. 3,028,576 on Gerard's application, entitled "Method and Apparatus for Making Thin Plastic Gloves." In 1957, Rene Orsini ("Orsini") filed a patent application for a manufacturing process essentially similar to that contained in the Gerard application. In 1961, upon learning of this potential interference to the issuance of the Gerard patent, Ethicon purchased Orsini's U.S. patent rights. Patent No. 3,153,481 was issued to Ethicon on October 24, 1964 on Orsini's application.

In October 1962, a few months after the issuance of the Gerard patent, Ethicon instituted patent infringement actions against two other manufacturers of disposable plastic gloves. On October 30, 1962, Ethicon filed an action in Delaware against Plasticsmith, Inc. ("Plasticsmith"), and on October 31, 1962, it filed suit in Nebraska against Mercury Manufacturing Company ("Mercury"). The suit against Plasticsmith was transferred by motion of the defendant to the Northern District of California, and was consolidated on consent with the suit against Mercury, which was also transferred to California. In 1964, after issuance of the Orsini patent, Ethicon amended its complaint against Mercury and Plasticsmith to add a cause of action for infringement of the Orsini patent. In 1966, Plasticsmith and Mercury merged into a successor corporation known as Handgards, Inc. ("Handgards"). Ethicon's ac-

---

1. The parties have stipulated to the facts underlying this action. This background, presented for the convenience of the reader, is based on those stipulated facts and the other documentary evidence before the Court.

tion continued thereafter as *Ethicon, Inc. v. Handgards, Inc.*

In 1968, Ethicon's action came to trial in the Northern District of California. On the second day of trial, Ethicon voluntarily dismissed its claims based on the Orsini patent. The action went forward on Ethicon's claims regarding infringement of the Gerard patent. On April 25, 1968, the District Court entered judgment for Handgards. In its findings of fact and conclusions of law, the Court found the Gerard patent to be invalid due to the prior public use by Plasticsmith's founder Lyle Shabram of the process covered by the Gerard patent. The decision of the District Court was affirmed. *Ethicon, Inc. v. Handgards, Inc.*, 432 F.2d 438 (9th Cir.1970), *cert. denied*, 402 U.S. 929, 91 S.Ct. 1525, 28 L.Ed.2d 863, *reh'g denied*, 403 U.S. 912, 91 S.Ct. 2204, 29 L.Ed.2d 690 (1971).[2]

On January 24, 1967, while the patent action against Handgards was still pending, Ethicon filed an action in Chicago against T. Hamil Reidy ("Reidy") for allegedly infringing the Gerard patent. Reidy had been the chief executive officer of Handgards' predecessor corporations.[3] That action was also transferred to the Northern District of California. On March 18, 1968, the Court dismissed the Reidy action without prejudice.

In June 1968, following its successful defense of the patent action, Handgards filed a complaint against Ethicon and Johnson & Johnson (hereinafter sometimes referred to as "the defendants") alleging that the defendants had violated sections 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1, 2.[4] In particular, Handgards alleged that the defendants had conspired to restrain trade in the disposable plastic glove market; had conspired to monopolize and attempted to monopolize the disposable plastic glove market; had individually attempted to monopolize the disposable plastic glove market; had monopolized, individually and collectively, the disposable plastic glove market; and had acquired the Scott Company to monopolize or lessen the competition in the disposable plastic glove market. The gravamen of Handgards' original complaint was that Ethicon had fraudulently obtained the Orsini patent by misleading the patent office as to the lack of any interference with that application.

The *Handgards* litigation did not move swiftly. The action was originally stayed to permit resolution of Ethicon's appeals of the patent action. Upon resolution of those appeals, Handgards moved to supplement its complaint to include acts allegedly committed by the defendants since the date of the original complaint. That motion was granted on May 15, 1974. The defendants moved for reconsideration, and Handgards cross-moved to amend its complaint to add a claim that Ethicon had fraudulently obtained the Gerard patent. Both the motion and the cross-motion were denied by the court. In January 1975, the defendants moved for summary judgment. In April 1975, that motion was granted in part and denied in part. The court dismissed Handgards' claims relating to the procurement of the Orsini patent. The court found, however, that there were genuine issues of fact in dispute relating to the antitrust impact of the various law suits Ethicon pursued against Handgards and its predecessor companies in relation to the Gerard and Orsini patent. The court stated that those lawsuits might be found to have been pursued in bad faith, knowing that the patents were invalid, or that even if Ethicon believed in good faith that the patents were valid, the suits were an integral part of a general scheme to monopolize. *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 921, 925 (N.D.Cal.1975).

A trial was held on the remaining claims in January and February 1976. The jury found for Handgards and, in July 1976, judgment was entered for Handgards in amount of $6,219,000, after trebling. In

---

**2.** The Court will refer to the suit on the Gerard patent as the "patent action."

**3.** Hereinafter this action will be referred to as the "Reidy action."

**4.** Hereinafter referred to as the *"Handgards* action."

1979, the Ninth Circuit reversed the jury's verdict due to improper jury instructions, and remanded for a new trial. *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688 and 689, 62 L.Ed.2d 659 (1980).

Following the denial of certiori, the parties returned to the district court where Handgards moved to amend its complaint to add a common law claim for malicious prosecution under California law. Ethicon vigorously opposed that motion, which was ultimately denied without opinion. In July 1982, the *Handgards* action again went to trial. The jury again found for Handgards, and awarded damages of $3,587,331. The court then trebled the damages found by the jury, added appropriate attorneys' fees, and entered judgment against Ethicon in amount of $11,826,936.10 plus interest. That judgment was upheld on appeal. *Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). Following the exhaustion of its judicial opportunities, Ethicon agreed to pay Handgards $18,900,000, in satisfaction of the amount owing on the judgment.

In June 1984, Ethicon first notified Aetna of a claim under a 1968 personal injury liability policy issued by Aetna to Johnson & Johnson and its subsidiaries. In November 1984, Aetna disclaimed coverage, asserting that, *inter alia,* Johnson & Johnson's failure to notify Aetna at an earlier date contravened the policy requirement that written notice be given as soon as practicable; the policy provided no coverage for injury arising out of wilful violation of a penal statute for antitrust injuries; and the insured had never informed Aetna that it was seeking coverage for any intentional or malicious acts it had committed.

In September 1985, Ethicon filed the instant action seeking indemnification under successive comprehensive general liability insurance, excess indemnity and excess overlayer indemnity policies in force from 1961 through 1974. In a prior ruling, this Court determined that the only policy definitely triggered by Ethicon's claims was policy #38 AL 5000 ("the 1961 policy").

The Court further found that policy #38 AL 128800 and the umbrella policy in effect in 1967 (collectively "the 1967 policies") might also be triggered, depending on the relation of the Reidy action to the ultimate award paid to Handgards. The Court denied coverage under the remain eight policies originally included in Ethicon's complaint. *Ethicon, Inc. v. Aetna Casualty and Surety Co.,* 688 F.Supp. 119 (S.D.N.Y. 1988).

In its earlier decision, the Court assumed, but did not decide, that Aetna had a duty to indemnify Ethicon for its injury resulting from the *Handgards* action. The parties are now before the Court on the issue of whether Aetna is, in fact, required to cover that injury. Ethicon contends that the sole basis for the jury's adverse verdict in the *Handgards* action was Ethicon's malicious, bad faith prosecution of the patent action against Handgards and its predecessors. Ethicon points to the insurance policies which provide coverage for injuries resulting from actions for malicious prosecution. Ethicon asserts that since the sole basis of the federal antitrust action was, in essence, the common law tort of malicious prosecution, it should be covered under those policies.

Aetna claims that it does not have a duty to defend or indemnify Ethicon's defense costs of liability in the antitrust action. Aetna contends that since the insurance policies at issue do not explicitly provide coverage for antitrust injuries, and the *Handgards* action was nothing but an antitrust case, there is no duty to defend or indemnify under the policies. Further, Aetna claims that even if it could be found to have duties to defend and indemnify a claim for antitrust injuries, those duties were discharged in this instance because the injuries for which Ethicon seeks coverage were intentional, and thus are outside the policy. Finally, Aetna urges that even if it is found to have a duty to indemnify Ethicon in the antitrust action, its duty to pay is limited to the actual compensatory damages found by the jury, not the damages as trebled under the Sherman Act, since treble damages are inherently punitive.

Additionally, the parties renew their disagreement as to whether coverage is provided by the 1967 policies as well as the 1961 policy. Ethicon maintains that the Reidy action, filed in 1967, was an integral component of the jury's findings and award in the *Handgards* action. Aetna claims that the Reidy action played little or no role in the ultimate disposition of the *Handgards* action, or the determination of damages in that case, and thus should not be considered as a trigger for coverage. The instant motion does not address, nor does it resolve, Aetna's contention that any liability it has is voided by Ethicon's alleged failure to give timely notice of its claim.

## DISCUSSION

Plaintiff has moved for partial summary judgment pursuant to Fed.R.Civ.P. 56. Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " '[A] motion for summary judgment shall be granted only "when, viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." ' " *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989), *quoting Pension Benefit Guaranty Corp. v. LTV Corp.*, 875 F.2d 1008, 1015 (2d Cir.), *cert. granted*, — U.S. —, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989), *quoting Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135, 138 (2d Cir.1989) (citations omitted).

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will probably preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied sub nom. Thomas J. Lipton, Inc. v. R.C. Bigelow, Inc.*, — U.S. —, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), *quoting* Fed.R. Civ.P. 56(c). *See also Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). However, Rule 56 does not require that the moving party support its motion with affidavits or other similar materials which negate the opponent's claim. Rather, "the motion may, and should, be granted so long as what is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552. "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2553.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which "must set forth facts showing that there is a genuine issue for trial." *Anderson, supra*, 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party must produce, at the summary judgment stage, "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, or is not sig-

nificantly probative, summary judgment may be granted." *Id.* While the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citations omitted).

Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U. S. Fire Ins. Co.*, 804 F. 2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), *citing Anderson, supra*, 477 U.S. at 247–50, 106 S.Ct. at 2509–11.

This Court has previously determined that the 1961 policy issued by defendant to Johnson & Johnson, and which provided coverage to Ethicon, would be triggered by Ethicon's losses in the *Handgards* action, should such coverage be appropriate under the policy and the applicable law. Under that policy, Aetna agreed:

> To pay on behalf of the insured all sums which the insured shall be come legally obligated to pay as damages because of injury sustained by any person or organization and arising out of the following hazards in the conduct of the named insured's business designated in the Schedule, and [Aetna] shall defend any suit against the insured alleging such injury and seeking damages which are payable under the terms of this endorsement, even if any of the allegations of the suit are groundless, false or fraudulent; but [Aetna] may make such investigation and settlement of any claim or suit as it deems expedient: Hazard A: False ar-

rest, detention or imprisonment, or malicious prosecution.[5]

The policy goes on to state that it does not apply "to injury arising out of the wilful violation of a penal statute or ordinance committed by or with the knowledge or consent of any insured." Further, the policy provides coverage for "occurrences." An occurrence, for purposes of the policy is defined to mean "an event, or continuous and repeated exposure to conditions, which unexpectedly causes injury during the policy period."

Aetna looks to the language of the policy in arguing that the antitrust damages incurred by Ethicon in the *Handgards* action are not covered by the insurance policies at issue. Aetna first notes that Handgards' complaint against Ethicon was entirely premised as an antitrust action and contained no common law causes of action. Since the policy does not explicitly provide coverage for liability arising from a statutory cause of action, Aetna had no duty to defend the *Handgards* action, and has no duty to indemnify Ethicon for the judgment rendered against it in that action. Aetna also argues that it could not provide a defense or indemnity in an antitrust action, since Aetna claims that a civil antitrust is a wilful violation of a penal statute of the sort explicitly excluded from coverage under the policy. Further, Aetna asserts that the *Handgards* jury found that Ethicon intended to injure *Handgards* by continuing its patent actions against Handgards and its predecessors, and that both the definition of occurrence in the policy and public policy prohibit recovery under the policy for intentionally inflicted injuries. Finally, Aetna asserts that even if it had a duty to defend the *Handgards* action and has a duty to indemnify Ethicon's loss arising out of that action, Aetna can only be held responsible for the compensatory portion of the award, not the trebled award paid by Ethicon, since antitrust treble damages are punitive in nature and as such are not covered under the policy.

Ethicon in turn argues that Handgards' claim was simply an allegation of malicious

---

5. Similar language appears in the 1967 policies, the applicability of which is discussed *infra*.

prosecution brought through the vehicle of a federal antitrust action. Ethicon contends that the law looks to the substance of the underlying claim, not to its title, to determine whether the duty to defend or to indemnify exists. Thus, according to Ethicon, the duties to defend and to indemnify exist in this case because Handgards' claim was simply an assertion of malicious prosecution on the part of Ethicon. Ethicon further maintains that Aetna's other grounds for denying liability are without merit. It asserts that a civil antitrust violation is not a violation of a penal statute, and also asserts that the jury in the *Handgards* action did not necessarily find that Ethicon intended the injury for which it was forced to pay damages. Finally, Ethicon claims that antitrust treble damages are not, by their nature, punitive, and thus are covered under the 1961 and 1967 policies.

### A) Applicable Law

 It is uncontested that New Jersey law applies to the interpretation and application of the insurance policies at issue.[6] Under New Jersey law, "clear basic terms and particular provisions of an insurance contract may not be disregarded at will and a new contract judicially made for the parties." *Linden Motor Freight Co. v. Travelers Insurance Co.*, 40 N.J. 511, 193 A.2d 217, 225 (N.J.1963). In general, however, when terms are ambiguous, New Jersey courts have extended protection to the insured. Insurance policies "should be construed liberally in ... favor [of the insured] to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'" *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22, 27 (N.J.1961), *quoting Danek v. Hommer*, 28 N.J.Super. 68, 76, 100 A.2d 198, 202 (N.J.App.Div.1953), *aff'd*, 15 N.J. 573, 105 A.2d 677 (N.J.1954). *See also Vargas v.*

*Calabrese*, 714 F.Supp. 714, 719 (D.N.J. 1989). Recently, the United States District Court for the District of New Jersey, interpreting New Jersey law, modified the general rule of interpretation in favor of the insured when that insured is a major corporation. *McNeilab, Inc. v. North River Ins. Co.*, 645 F.Supp. 525 (D.N.J.1986), *aff'd*, 831 F.2d 287 (3d Cir.1987). In that case, which also involved a Johnson & Johnson subsidiary, the Court stated,

> Although there are not New Jersey cases directly on point, it would seem that the New Jersey courts would decide that insurance policies of large, skilled corporations—and here I venture to suggest, Johnson & Johnson is larger than its insurers—would be treated as ordinary contracts. Such a position would dovetail with the New Jersey policy that insurance policies are generally strictly construed because they are contracts of adhesion, i.e., they are products of unequal bargaining power.

645 F.Supp. at 546 (citations omitted). *See also Vargas, supra,* 714 F.Supp. at 720.

This Court finds the *McNeilab* court's logic compelling.[7] Accordingly, in the instant action, the Court will interpret the insurance policy as it would any other contract between parties of equal bargaining power, in light of the existing New Jersey insurance law. The Court is fully aware that portions of the policies are standard language drafted by the insurance industry. However, the Court believes that Johnson & Johnson was fully capable of negotiating for terms which it felt to be important for its insurance coverage.

### B) Duty to Defend

 With this in mind, the Court turns to the substantive disputes at issue. In determining the scope of an insurer's liability for a loss incurred by the insured, the

---

6. Indeed, the application of New Jersey law to the insurance policies is the law of the case in this instance. This Court has previously explained the bases for the employment of the New Jersey law. *Ethicon, supra,* 688 F.Supp. at 123–24.

7. The fact that Ethicon claims that no negotiations actually took place over the details of the

terms of the insurance policies at issue, *see* Affidavit of David F. Dobbins, Esq., sworn to on July 14, 1986, ¶ 4, has no bearing on the Court's view of this matter. Johnson & Johnson had the market power to negotiate with its insurers on an even field. The fact that it chose not to do so will not affect that Court's determination of the proper reading of the policies at issue.

Court must address two aspects of the duty assumed by the insurer: the duty to defend and the duty to indemnify. The duty to defend is broader. *See EAD Metallurgical, Inc. v. Aetna Casualty & Surety Co.*, 905 F.2d 8, 11 (2d Cir.1990). In general, an insurer must assume the defense of any action filed against the insured which might fall within the ambit of the coverage. The duty to indemnify arises only after the completion of litigation. At that point, the insurer looks at the loss retroactively and sees if that particular loss falls within the coverage. Thus, the fact that a certain action may trigger the insurers' duty to defend does not mean that that same insurer will have to indemnify any loss resulting from that action, since it may well develop that the action, which on its face involved a covered activity, in fact is related to an uncovered action.

■ The parties agree that there is no New Jersey case law directly addressing the issue of whether an action sounding in antitrust but grounded in a covered common law action is afforded coverage under a standard insurance policy. The Second Circuit has stated that when a court is "presented with an absence of controlling state authority, [it] must 'make an estimate of what the state's highest court would rule to be its law.'" *DeWeerth v. Baldinger*, 836 F.2d 103, 108 (2d Cir.1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988), *quoting Stafford v. International Harvester Co.*, 668 F.2d 142, 148 (2d Cir.1981) (citation omitted). *See also Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). Absent a rule of law established by the state's highest court, a federal court sitting in a diversity action are not bound by the opinions of that state's lower courts, *Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 195 (2d Cir.1989), but must look to all the sources it believes the state's highest court would use in reaching a decision on the instant issue, including decisions on similar or analogous issues from different jurisdictions. *See Sobiech v. International Staple & Machine Co.*, 867 F.2d 778, 783 n. 8 (2d Cir.1989).

The parties have presented the Court with a number of cases from lower New Jersey state courts and from other jurisdictions which address the issues before the Court. In reviewing those cases, and other authorities, it is clear to the Court that the central issues for both the duty to defend and the duty to indemnify are, first, whether an insurer can be held responsible for the defense and indemnity of a claim sounding in a federal statutory scheme that mimics a covered common law action, and, second, whether Handgards' allegations and the jury's ultimate finding against Ethicon were in fact substantially and sufficiently similar to a claim for malicious prosecution to warrant coverage.

The most informative of the cases presented to the Court is *Tews Funeral Home, Inc. v. Ohio Casualty Ins. Co.*, 832 F.2d 1037 (7th Cir.1987). In that action, the Court affirmed and adopted the opinion and order of the district court below which found that the defendant insurance company had a duty to defend an antitrust claim that was joined to a common law business disparagement claim. The Court found that since the antitrust claim arose out of the same allegations as the common law claim, which was clearly covered by the insurance policy, the insurer had the obligation to defend the entire action. *Tews* is helpful not only because of the teaching of its holding, but also in the extensive and scholarly review given by the Court to the state of the law in various jurisdictions on this issue.

■ It is clear from the opinion in *Tews*, and from this Court's independent review of the law, that an insurer has a duty to defend an action containing allegations of covered common law claims and federal statutory claims arising from the same facts and allegations, despite the fact that the federal claim is not explicitly covered in the policy. *See Tews, supra; Ruder & Finn, Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981); *Federal Ins. Co. v. Cablevision Systems Development Co.*, 637 F.Supp.

1568 (E.D.N.Y.1986). Indeed, defendant does not seriously contest this conclusion.

■ The more difficult question is whether a complaint sounding solely in a federal statutory claim not explicitly covered by the policy but based on allegations that could support a covered common law claim triggers the duty to defend. The case most closely analogous to the one before the Court which addresses this issue is *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal.App.3d 598, 222 Cal.Rptr. 276 (Ct.App. 1st Dist.1986). In *CNA Casualty*, the California court required defense of a complaint stating only a federal antitrust claim.[8] The court stated that in determining whether the duty to defend was triggered it would "[l]ook[ ] to the facts alleged in the [ ] complaint rather than the formal theory of liability or cause of action pleaded...." 222 Cal.Rptr. at 280. Using this analytical frame, the court found that the facts and issues underlying the antitrust claim triggered the duty to defend.

The logic of the *CNA Casualty* court is consistent with the rulings in *Tews, Ruder & Finn* and *Federal Insurance*. In essence, each court held that the duty to defend does not depend on the label of the claim asserted against the insured, but on how the facts of that claim relate to activity covered under the insurance policy. The fact that, in *Tews, Ruder & Finn* and *Federal Insurance*, there was also a common law claim in the action that was clearly covered is not sufficient to distinguish those cases from the one now before this Court. The Court thus finds that if the underlying facts and allegations of Handgards' claims against Ethicon averred a pattern of activity which would, if pled as a common law claim, be covered under the policies at issue, then Aetna had a duty to defend that action (or reimburse for de-

fense costs), even if the claim was labelled as one for federal antitrust injuries.

A close examination of the *Handgards* action is essential to determining whether Aetna as insurer incurred a duty to defend based on the allegations in that case. This is not a simple matter, as the nature of Handgards' allegations changed during the tortuous course of its litigation against Ethicon. When originally filed in 1968, Handgards' complaint focused on an alleged *Walker Process* violation—that is, the enforcement of the supposedly fraudulently obtained Orsini patent. *See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In 1975, in the face of a motion for summary judgment by Ethicon, Handgards abandoned its *Walker Process* claim and refocused its allegations to assert that Ethicon, as part of an overall scheme, prosecuted a series of patent actions against Handgards and its predecessors in bad faith. It was generally this claim that was the subject of the first trial. However, the Ninth Circuit reversed the jury's finding in favor of Handgards, and in doing so left Handgards with a claim based entirely on the alleged bad faith prosecution of patent cases. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688 and 689, 62 L.Ed.2d 659 (1980).

A review of Handgards' amended and supplemental complaint, filed in 1974, indicates that, on its face, the complaint alleged facts and claims that could be said to comprise a common law claim for malicious prosecution, which is explicitly covered by the policies at issue. *See* Affidavit of Robert P. LoBue, Esq., sworn to on March 9, 1989 ("LoBue Aff."), Exh. D, ¶ 14n.[9] Given the scope of the duty to defend, this amended and supplemental complaint, as-

---

8. The complaint originally contained a second common law count. That count was dismissed by the trial court at an early stage in the litigation.

9. Defendant asserts that it was the supplemental complaint, not the amended and supplemental complaint, on which the *Handgards* action was originally tried. While the Court does have

sufficient information before it to determine which complaint formed the basis of the trial, the supplemental complaint also provided sufficient notice of the facts and allegations of Handgards' claims regarding malicious prosecution. *See* Affidavit of Daniel Gammerman, Esq., sworn to on April 7, 1989, Exh. E, ¶ 14k–m.

serting the initiation and continuation of law suits in bad faith, is sufficient to trigger the duty to defend at least that portion of Handgards' claims which alleged bad faith prosecution claims in violation of the antitrust laws. This conclusion is bolstered by a review of the Joint Pretrial Statement filed by Handgards and Ethicon before the second trial in 1982. *See* LoBue Aff., Exh. E; Affidavit of Daniel Gammerman, Esq., sworn to on April 7, 1989 ("Gammerman Aff."), Exh. G. In that statement, plaintiff alleges facts which would make out a claim for malicious prosecution. Accordingly, the Court finds that the duty to defend was triggered.

Defendant asserts that, even if the duty to defend was triggered by the supplemental complaint or other materials in the *Handgards* action, defendant would not have had to assume defense of the action because a conflict of interest existed between its interests and those of Ethicon in defending the action. Defendant cites *Burd v. Sussex Mutual Ins. Co.*, 56 N.J. 383, 267 A.2d 7 (1970), for the proposition that where such a conflict exists, the insurer is not permitted to assume the defense of the action. Since the insurer is not defending that action, its liability is converted solely to a duty to reimburse following the outcome of the action, if it is found that the action was indeed one covered by the policy. In the instant action, defendant alleges that such a conflict would have existed because it would only have been obliged to defend that portion of the action alleging malicious prosecution, while not defending the overall antitrust action. This argument assumes that, in the instant case, Handgards' antitrust action contained numerous allegations beyond those which could have been considered to have made out a claim for malicious prosecution. While this contention might have been valid as to Handgards' original antitrust compliant, which included the *Walker Process* claims, by the time of the 1982 trial, out of which the recovery at issue arose, the only claim remaining against Ethicon was for bad faith prosecution amounting to an antitrust violation. Defeating the bad faith elements of the claim, which would defeat

any possible common law malicious prosecution claim, also would have defeated Handgards' antitrust action. Thus, the Court finds that there was no conflict of the sort anticipated by the court in *Burd*.

*C) Duty to Indemnify*

Having determined that Aetna had a duty to defend the *Handgards* action, the Court must decide if Aetna has a duty to indemnify Ethicon for its losses as a result of that action. As noted above, the duty to indemnify is far narrower than the duty to defend. Whereas an insurer's duty to defend is viewed from the beginning of a lawsuit, the duty to indemnify is decided after the completion of litigation. It is a retrospective, rather than a prospective, determination. *See, e.g., Mt. Hope Inn v. Travelers Indemnity Co.*, 157 N.J.Super. 431, 384 A.2d 1159, 1162 (N.J.Super.Ct. 1978). The Court must look at the findings of the Court and determine whether the injury found, and the cause of action decided, fit within the insurance policy at issue. Nonetheless, the duty to defend and the duty to indemnify are related, and where the duty to defend arises, the duty to indemnify often follows. *Burd, supra,* 267 A.2d at 10. In the instant case, the Court must decide if the findings of the *Handgards* jury, which resulted in a total verdict of almost $12 million for Handgards, arose from the type of injury covered by the Aetna policies.

Again, New Jersey law provides little guidance on this issue. Plaintiff points to a line of analogous cases arising from civil rights actions under 42 U.S.C. § 1983. *See Caplan v. Johnson*, 414 F.2d 615 (5th Cir.), *reh'g denied*, 417 F.2d 781 (5th Cir. 1969); *Colton v. Swain*, 358 F.Supp. 859 (N.D.Ill.1973), *aff'd*, 527 F.2d 296 (7th Cir. 1975); *Peoria v. Underwriter's at Lloyd's London, Unincorporated*, 290 F.Supp. 890 (S.D.Ill.1968); *Goshen v. Grange Mutual Insurance Co.*, 120 N.H. 915, 424 A.2d 822 (1980). In each of these cases the respective courts found that the underlying claim in the action brought pursuant to 42 U.S.C. § 1983 included assertions that were identical or substantially similar to common law claims covered by the applicable insurance

policy. Absent an explicit exclusion for coverage of statutory as opposed to common law claims, each court found that the insurer had the duty to defend and indemnify the insured for its losses as a result of the § 1983 suits.

This line of cases has been adopted by the lower courts in New Jersey. *City of Newark v. Hartford Acci. & Indem. Co.*, 134 N.J.Super. 537, 342 A.2d 513 (N.J.App. Div.1975). In *City of Newark*, as in the other cases cited above, the municipality had an insurance policy which covered it for a series of common law torts, including false arrest and malicious prosecution. The City and some of its employees were sued under § 1983 by individuals alleging unlawful arrest and malicious prosecution. While the Court found only a duty to defend, as the underlying federal action had not yet been completed, it is clear from a reading of the case that indemnification would also be proper if the ultimate resolution of the federal action showed that the insured had indeed committed acts which could be identified as among the covered common law torts.

Defendant, relying on a series of cases decided more than twenty-five years ago, urges this Court to find that *City of Newark* was wrongly decided. This the Court declines to do. Defendant has failed to provide clear evidence that *City of Newark* is in conflict with precedents from the New Jersey Supreme Court, or that it is out of step with the state of the law on this issue. Indeed, defendant cites no modern case from any jurisdiction that rejects the principles of *City of Newark*. Accordingly, in the absence of any direction from the New Jersey Supreme Court on this issue, the Court will adopt the holding of *City of Newark* as controlling in this case.[10] Defendant argues that the policy is clear on its face: it provides coverage only for the stated common law offenses. This is a

misstatement of the policy language. The policy covers losses arising from, among other torts, malicious prosecution. There is no limitation in the policy to coverage only when the lawsuit at issue in grounded in common law, nor is there an exclusion of statutory claims. The Court will not read such a limitation or exclusion into the policy.

Finding that a statutory claim can trigger the duty to indemnify does not end the Court's inquiry. The Court must determine if the findings of the jury in the *Handgards* action fit within the coverage of the instant insurance policies, and, if so, whether any of the exclusions in the policies apply to those findings.

The parties have argued extensively about the meaning of the jury's verdict in the *Handgards* action. The Court has undertaken a careful review of the findings of the jury, the relevant instructions placed before the jury, and the opinions of the Ninth Circuit on the jury verdicts. The two circuit court opinions provide substantial guidance to the Court in determining what was placed before the jury, and what was necessarily decided by that jury. Following the 1976 trial, the Ninth Circuit reversed the jury's finding in favor of Handgards on the ground that the trial court had improperly instructed the jury on the standard for deciding whether Ethicon had pursued patent litigation in bad faith with intent to monopolize. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688 and 689, 62 L.Ed.2d 659 (1980) (hereinafter *"Handgards I"*). In overturning the verdict and remanding for a new trial, the Court limited the issues to be placed before the jury, and expressly stated the standard under which the jury was to review Handgards' antitrust claims. "[T]he jury should be instructed that a

---

**10.** At least one case has implicitly extended the holding of these § 1983 cases to antitrust actions. *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 221 Cal.Rptr. 171 (Ct.App. 4th Dist.1985). While the Court believes that plaintiff's heavy reliance on this case is somewhat misplaced, the case does provide an instructive and exhaustive analysis of anti-

trust actions and insurance covering common law torts. Because the Court concludes that *City of Newark*, read in connection with the duty to defend cases relating to antitrust claims, provides sufficient support for the existence of a duty to indemnify in an antitrust action, the Court need not and will not place significant reliance on *California Shoppers*.

patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." 601 F.2d at 996. In its review of the 1982 trial, the Ninth Circuit explicitly held that there was sufficient evidence at trial to support the finding of the jury that Ethicon had prosecuted its patent actions in bad faith, even in light of the strict standard delineated in its earlier opinion. *Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985) (hereinafter *"Handgards II"*).

Defendant does not strongly contest that the jury made a finding of bad faith prosecution. It does challenge the relationship of that finding to the tort of malicious prosecution. First, defendant argues that the finding of bad faith prosecution was only part of the total finding of an antitrust violation. It is true that intent to monopolize is required for a finding of violation of the Sherman Act. *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). However, in *Handgards I,* the Ninth Circuit explicitly found, "The requisite intent to monopolize could be inferred from the finding of bad faith." *Handgards I,* 601 F.2d at 993 n. 13. *See also National Asso. of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories,* 850 F.2d 904, 915 (2d Cir.1988). In fact, in *Handgards II,* the Court implied that there was no direct evidence at trial of Ethicon's intent

to monopolize, but found that "[s]ubstantial evidence exists to support" an inference of intent drawn from the finding of bad faith prosecution. *Handgards II,* 743 F.2d at 1293. This Court chooses to follow the Ninth Circuit's interpretation of the evidence and of the jury's findings in light of that Court's great familiarity with the facts and law of the overall *Handgards* action. Accordingly, the Court finds that the central, and crucial finding of the *Handgards* jury was that Ethicon prosecuted its patent in bad faith. Without this finding, Ethicon could not have been found in violation of the Sherman Act, and under the ruling of *Handgards I,* that finding was sufficient to hold Ethicon in violation of the antitrust laws.[11]

Defendant further asserts that, even if the finding of bad faith prosecution was central to Handgards' antitrust claim, the bad faith prosecution found by the jury is not equivalent to the common law tort of malicious prosecution. As a threshold matter, the Court must confront the parties' competing contentions regarding the proper law to apply to the determination of whether the jury's finding was equivalent to malicious prosecution. Plaintiff asserts that California law should apply as that is the state in which the *Handgards* action was tried and whose laws would have applied should Handgards have chosen to pursue a common law rather than a federal claim. Defendant maintains that New Jersey law, which controls the coverage issues in the instant action, should also control this common law determination.

The Court agrees with plaintiff that California law should apply to this particular

11. In 1980, Handgards moved to amend it complaint to add a common law claim for malicious prosecution, which Ethicon opposed vigorously. The court denied the motion to amend without opinion. *See* p. 1324, *supra.* Defendant urges this Court to read into that denial of the motion an inference that the court found the malicious prosecution claim to be as substantially different from the existing antitrust claim, thus creating unnecessary delays and prejudice. This Court can draw no such inference from the trial court's ruling. First, the focus of Ethicon's opposition to Handgards' motion was that an amendment to the complaint so late in the litigation was unduly prejudicial due to the delay,

the different standards of proof applicable to the antitrust and common law claims, and questions regarding the applicable law and possible preemption. Ethicon did not, as defendant would have the Court believe, assert that a common law claim for malicious prosecution was wholly different from the existing antitrust claim, though it did point out some differences Ethicon alleges would have caused a need for additional discovery. The focus of Ethicon's argument, and, this Court finds, the probable focus of the trial court's ruling, was the undue delay and resulting prejudice from the late motion to amend. *See* LoBue Aff., Exh. M.

issue. This conclusion is reached through common sense and reason. If Handgards had sued Ethicon for common law malicious prosecution in California and had prevailed, it would defy logic for Aetna to be able to deny coverage on the grounds that a finding of malicious prosecution in California does not necessarily come within the policy because California law differs from New Jersey law.[12] Nothing in the policy, or elsewhere, indicates that New Jersey law should control the definition of the common law claims covered by the policy. Aetna alleges that Handgards did not make out a claim equivalent to common law malicious prosecution. In support of that assertion, Aetna maintains that the findings of the *Handgards* jury could not have resulted in a holding of malicious prosecution. To make that determination, the Court must look to that jury sitting in California, and decide whether it could have found common law malicious prosecution based on the record before it. If common law malicious prosecution had been before that jury, it is uncontrovertible that California law would have applied to their determination.[13]

California, like most states, has a broad definition of the tort of malicious prosecution. In order to make out a claim for malicious prosecution in California, a plaintiff must show "1. A criminal proceeding instituted or continued by the defendant against the plaintiff. 2. Termination of the proceedings in favor of the accused. 3. Absence of probable cause for the proceeding. 4. 'Malice,' or a primary purpose other than that of bringing an offender to justice." *Bulkley v. Klein,* 206 Cal.App.2d 742, 23 Cal.Rptr. 855, 858 (Cal.App. 4th Dist.1962), *quoting Prosser on Torts* 646 (2d ed. 1955). There is no doubt that the *Handgards* jury made findings that fulfill the fourth prong of the tort. Further, it is

clear that the second prong was satisfied by Ethicon's defeat in the patent actions. Thus, the focus of the Court inquiry must be on the first and third prongs of the standard.

It is uncontested that the jury found that Ethicon had continued prosecution of the patent actions in bad faith. It is also uncontested that the jury did not find that the suits were instituted in bad faith. The jury apparently found that Ethicon believed the Gerard patent to be valid at the time it filed the first of the patent suits, but that while those suits were pending, Ethicon obtained information that the patent was in fact not valid. Nonetheless, Ethicon continued the infringement suits. This continuation of the actions was, the jury found, in bad faith. Under the California formulation, this continuation of an action in bad faith is sufficient to meet the first prong of the standard.

Similarly, this bad faith continuation of the patent actions meets the third prong of the standard. While there may have originally been probable cause for the patent actions, the jury in the *Handgards* action necessarily found that at some point there ceased to be probable cause for those infringement suits. The third prong of the standard does not require there to have been a lack of probable cause at the initiation of the action, only that there was no probable cause at some point, beyond which the knowing plaintiff continued the action. Thus, since the *Handgards* jury made findings that meet the requirements for a malicious prosecution claim in California, the Court finds that coverage for Ethicon's losses should be provided, absent some affirmative defense against such coverage.

### D) Wilful Injury

■ Aetna has tendered two important affirmative defenses against coverage, only

---

**12.** The Court notes that "A claim of malicious prosecution brought pursuant to section[ ] 1983 ... is governed by state law in the absence of federal common law." *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989).

**13.** In a letter submitted to the Court, after the adjourned return date of this motion, defendant argued that plaintiff had in essence admitted that California law did not apply by arguing in

its reply brief that New Jersey law would reach the same result as California law. As defendant well knows, plaintiff was simply arguing in the alternative when it addressed this issue in light of New Jersey law. As defendant's own memorandum of law is replete with alternative arguments, its attempt to turn such an argument into an admission is not well taken.

one of which is currently before the Court. Aetna asserts that the *Handgards* jury found that Ethicon had committed a wilful act and had intended the injuries for which Handgards received its damage award. Such a wilful injury, Aetna contends, is not covered by the policy, and recovery for intentional injuries is barred by New Jersey public policy. Second, Aetna argues that Ethicon's failure to provide timely notice of its claim bars recovery. The latter argument is not currently before the Court.

The parties do not dispute that coverage for intended injuries is not available under New Jersey law. Thus, for example, coverage is not available for an arsonist for the damage he causes to the building he sets afire, but coverage might be available for unintended injuries, such as the lost wages of the employees who normally work in that building, even though the arson itself was an intentional act. *See, e.g., Ambassador Ins. Co. v. Montes*, 147 N.J.Super. 286, 371 A.2d 292 (N.J.App.Div.1977), *aff'd*, 76 N.J. 477, 388 A.2d 603 (N.J.1978).

In the instant case, there can be little doubt that the *Handgards* jury found that Ethicon intended to monopolize the applicable market. While the parties quibble over whether the jury made such a finding explicitly, or drew it implicitly, from the evidence of bad faith prosecution, the result is the same: a finding of intent to monopolize. Defendant urges the Court to focus on this finding. But the intentional nature of the act is not the determining factor in deciding whether coverage is available. Instead, the Court must focus on whether the injuries compensated by the damage award were intentional. Handgards was compensated for the profits which it lost as result of Ethicon's bad faith prosecutions of the patent actions. The issue for the Court is whether that loss of profit was an injury intended by Ethicon which was properly redressed by the damages award. Upon careful review of the record, the Court does not believe that the damage award received by Handgards can be considered compensatory for intended injuries.

Plaintiff correctly states that the purpose of the antitrust laws is to protect *"competition,* not *competitors." Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), *quoting Brown Shoe Corp. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). *See also Juster Associates v. Rutland,* 901 F.2d 266 (2d Cir. 1990); *Eastway Construction Corp. v. New York,* 762 F.2d 243, 250–51 (2d Cir. 1985). The act of monopolization is an attack on the marketplace, not necessarily against specific competitors. There is nothing in the jury's findings or in either of the Ninth Circuit's opinions that indicates that Ethicon intended the specific injuries for which Handgards was compensated.

■ There must be a direct, intentional relationship between the wilful act and the injury for which coverage is sought in order for an insurer successfully to deny coverage due to the allegedly intentional nature of the injury. A broad reading of what constitutes an intentional injury would lead to an untenable result with respect to coverage for intentional torts. It would be disingenuous at best for an insurer to state that it covers losses arising from allegations of intentional activity of the insured only to be able to deny coverage for an injury arising from that activity based on a broad view of intentional injury. It follows that the injury compensated, and for which coverage is sought, must be *directly* intended by the insured for coverage to be denied. Thus, the damage to the building caused by the arsonist discussed above would be direct, intended injury, and thus not subject to coverage, while damage to the building down the street would not be considered as directly intended, and thus would be covered by the appropriate insurance policy. In the instant case, there is no evidence that the lost profits which Handgards proved at trial were injuries directly intended by Ethicon. Accordingly, any exclusion of coverage for intentional injuries, based on the terms of the policy or on public policy, is not applicable in the instant

case.[14]

### E) Treble Damages

Defendant next argues that, even if it must provide coverage for the jury's award of compensatory damages, it has no duty to provide coverage for the treble damages awarded to Handgards under the antitrust laws because those damages are punitive in nature. Plaintiff responds that antitrust treble damages are not punitive, and even if they are considered punitive, there is no explicit exclusion of punitive damages in the Aetna policies.

■ The issue of the availability of coverage for punitive damages is the most clearcut of the issues regarding coverage of the treble damages award. Regardless of the effect of language in the insurance policy at issue, the public policy of New Jersey, as expressed by its courts, prohibits indemnification of a claim for punitive damages. *See, e.g., City of Newark, supra,* 342 A.2d at 518. *Cf. Home Insurance Co. v. American Home Products,* 873 F.2d 520 (2d Cir.1990) (it is against New York State public policy to indemnify punitive damages).

■ Neither the Supreme Court nor, apparently, any of the circuit courts has directly stated whether antitrust treble damages are to be considered punitive or non-punitive in nature. This Court has undertaken a thorough review of the caselaw on the treble damages provisions within the antitrust laws and finds that the clear focus in the application of antitrust treble damages is compensatory and not punitive. This is not to say that the intent of the treble damage provision is entirely clear. "[A] review if the case law indicates that there is no clear-cut distinction as to whether antitrust treble damages are punitive or remedial." *In re National Mortg. Equity Corp. Mortg. Pool Certificates Secur. Litigation,* 636 F.Supp. 1138, 1155 (C.D.Cal. 1986).

The Supreme Court has reviewed the nature of antitrust treble damages on a number of occasions in recent years. In *Brunswick, supra,* the Court explained, "Of course, treble damages ... play an important role in penalizing wrongdoers and deterring wrongdoing.... It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy." 429 U.S. at 485–86, 97 S.Ct. at 695–96 (citations omitted). The Court reviewed the legislative history of the treble damage provisions in the antitrust laws, finding that, while punishment was part of the purpose behind the provision, other concerns predominate, including compensating plaintiffs for the difficulty of bringing private antitrust actions, encouraging enforcement of the law, and assuring proper compensation for losses incurred as a result of an antitrust injury. *Id.* at 486 n. 10, 97 S.Ct. at 696 n. 10. In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Court crystallized the legislative history, explaining that Congress had an " 'expansive remedial purpose' " in enacting the treble damages provision: "Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." 457 U.S. at 472, 102 S.Ct. at 2544. At no point, however, has the Court clearly delineated a determination of the ultimate nature of the treble damages provision. Indeed, the Court has consistently maintained that the purpose of the provision is intentionally mixed. *See American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575–76, 102 S.Ct. 1935, 1947, 72 L.Ed.2d 330 (1982).

It is apparent, however, from the substance of the cases in which the Supreme

---

**14.** Defendant also argues that the antitrust laws are penal in nature, and thus a violation of those laws implies a wilful violation of such a penal statute, which cannot be indemnified. While it is true that criminal sanctions are available under portions of the antitrust laws, the *Handgards* action was purely civil, was filed under the civil penalty provisions of the antitrust laws, and thus cannot be considered penal in nature.

Court and other courts have addressed the nature of the treble damages provision, that the courts believe that the provision is primarily remedial, not punitive. Indeed, in *Hydrolevel*, the Court stated that the antitrust private action, of which the treble damages provision is an integral part, "was created primarily as a remedy for the victims of antitrust violations. Treble damages 'make the remedy meaningful by counterbalancing "the difficulty of maintaining a private suit" ' under the antitrust laws." 456 U.S. at 575, 102 S.Ct. at 1947. *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S.Ct. 2326, 2334, 60 L.Ed.2d 931 (1979). The Court's holding in *Hydrolevel* is instructive, for in that case the Court found that treble damages could be imposed on a principal even though the harm resulted from the acts of the agent. The principal had argued that treble damages could not be shifted from the agent because they are inherently punitive. The Court rejected that argument, concluding that "since treble damages serve as a means of deterring antitrust violations and of compensating victims, it is in accord with both the purposes of the antitrust laws and principles of agency law to hold [the principal] liable for the acts of agents committed with apparent authority." *Hydrolevel, supra,* 456 U.S. at 575–76, 102 S.Ct. at 1947. *Cf. In re National Mortgage, supra,* 636 F.Supp. at 1155. Other courts have similarly reached results where antitrust treble damages are treated differently from common law punitive damages. In *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir.1986), the Seventh Circuit upheld the award of treble damages against a decedent's estate. Noting that there were cases which indicated that punitive damages were not recoverable after the death of the wrongdoer, the Court upheld the determination of the district court that antitrust damages were not controlled by the rules for common law punitive damages. 807 F.2d at 560–61.

Further, It has long been the law that a party seeking recovery under the antitrust laws need not show malice or bad faith on the part of the violator in order to obtain the imposition of treble damages. *See, e.g.,*

*Sun Theater Corp. v. RKO Radio Pictures, Inc.*, 213 F.2d 284 (7th Cir.1954). This is wholly different from common law punitive damages, where "[i]n order to state a claim for which punitive damages must be awarded, wanton behavior or conduct evidencing a criminal disregard for civil liability on the defendant's part must be pleaded." *Lovebright Diamond Co. v. Spragins*, 574 F.Supp. 76, 80 (S.D.N.Y. 1983). *See also Cipollone v. Liggett Group, Inc.*, 683 F.Supp. 1487, 1500 (D.N.J. 1988); *Machleder v. Diaz*, 618 F.Supp. 1367, 1374–75 (S.D.N.Y.1985) (applying New Jersey law), *aff'd in part and rev'd in part,* 801 F.2d 46 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987).

The New Jersey definition of punitive damages for which indemnity is not allowed is clear. "In this State punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious. The underlying theory is to punish the offender for aggravated misconduct and to deter such conduct in the future." *Variety Farms, Inc. v. New Jersey Mfrs. Ins. Co.*, 172 N.J.Super. 10, 410 A.2d 696, 703 (N.J.App.Div.1980). Antitrust treble damages fall outside that definition. There is no requirement of a showing of egregious conduct, or wilfulness of injury, in order for treble damages to be imposed. A showing of harm arising from a proven antitrust injury results automatically in the imposition of the trebling provision. Thus, in light of the fact that antitrust treble damages do not come within the definition of punitive damages for which indemnity is improper, and because of the indication of the Supreme Court that antitrust treble damages are primarily remedial and not punitive, the Court finds that defendant is liable to indemnify plaintiff for its entire loss after trebling, up to the limits of the applicable policies.

*F) 1967 Policies*

■ Plaintiff has also moved for summary judgment on the issue of the triggering of the 1967 policies. As noted above, this Court in its previous opinion in this

matter found that the only Aetna policy definitively triggered by the *Handgards* action was the 1961 policy. However, the Court also held that the 1967 policies might be triggered, depending upon the impact of the Reidy action on the jury's verdict in the *Handgards* action. The Court found that there was a genuine issue of fact in dispute as to whether the Reidy action was considered by the jury in reaching its verdict. Accordingly, the Court declined to decide finally whether the 1967 policies were triggered. *See* 688 F.Supp. at 128.

The Court will not repeat the extensive legal analysis contained in its previous opinion. *See* 688 F.Supp. at 124–28. The Court has reviewed the materials submitted by the parties in support of the instant motion and in support of the earlier cross motions for summary judgment. Based on this review, the Court finds that the Reidy action was before the *Handgards* jury, and was considered in reaching the verdict against Ethicon. While there is an extensive dispute as to which version of the complaint was used at trial, and whether that particular version contained a reference to the Reidy action, there is no doubt that the Reidy action was mentioned in the undisputed facts in the parties' joint pre-trial statement filed before the second *Handgards* trial. LoBue Aff., Exh. E, ¶ (d)(10). Further, evidence of Handgards' expenses incurred as a result of the Reidy action were included in the calculation of damages granted Handgards after the second jury trial. LoBue Aff., Exhs. F, G, H. Thus, the 1967 policies were triggered, as the Reidy action was before the *Handgards* jury.

The fact that the 1967 policies were triggered by the filing of the Reidy action does not end the Court's inquiry. Defendant has argued convincingly that the triggering of that policy extends only to damages granted directly resulting from the filing of the Reidy action. Plaintiff relies on *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) to argue that once the 1967 policies were triggered, it must be deemed to cover the entire loss arising out of the *Hand-gards* action. The Court finds plaintiff's reliance on *Keene* misplaced, and its argument otherwise unsupported.

*Keene* involved the somewhat unique insurance ramifications arising out of the legion of asbestos-related litigation currently pending throughout the country. The *Keene* court was faced with the difficult and critical question of the scope of insurance coverage available to asbestos manufacturers. One of the issues before the Court was the extent of the coverage available under the triggered policies. The Court found that once an injury of an individual triggered one of the policies, that the individual's entire asbestos-related injury was covered, regardless of whether a portion of the injury occurred outside of the coverage period. *Keene, supra,* 667 F.2d at 1048–49.

In applying *Keene* to the instant situation, it is crucial to define the injury in question. In *Keene,* the injury was the asbestosis, or other lung ailment, resulting from an individual's exposure to asbestos. The focus of the coverage was on that individual and his or her injury. In the instant case, the triggering event for the 1967 policies was the filing of the Reidy action. The coverage, even under the *Keene* rule, would be limited to harm resulting from the *Reidy* action only, whether that harm occurred within the coverage period or not. There is nothing in *Keene* which would permit coverage by the 1967 policies of the harm arising from the other patent actions filed by Ethicon, since those actions, as was noted by this Court in its prior opinion, triggered only the 1961 policy. Thus, the Court finds that coverage under the 1967 policies is limited to the loss arising from the filing of the Reidy action. The Court has insufficient evidence before it at this time to determine the extent of that loss.

## CONCLUSION

Plaintiff's motion for partial summary judgment is granted in part and denied in part.

Counsel shall contact the Court within twenty days of this order to set a date convenient for counsel and the Court for a pretrial conference.

SO ORDERED.